Jack B. Speight
Robert T. McCue
Patrick J. Crank
Matthew D. Obrecht
SPEIGHT, McCUE & CRANK, P.C.
2515 Warren Avenue, Suite 505
P. O. Box 1709
Cheyenne, WY 82003-1709
(307) 634-2994
Fax: (307) 635-7155

ATTORNEYS FOR PLAINTIFFS


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| ROBERT A. NAROTZKY, M.D., THOMAS A. KOPITNIK, JR., M.D., DEBRA STEELE, M.D., and CENTRAL WYOMING NEUROSURGERY, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 08-CV-27-B |
| BOARD OF TRUSTEES OF MEMORIAL HOSPITAL OF NATRONA COUNTY; WYOMING MEDICAL CENTER, INC., a Wyoming non-profit corporation; BOARD OF DIRECTORS OF WYOMING MEDICAL CENTER, INC.; MIKE REID, in his official capacity as Chairman of the Board of Directors of Wyoming Medical Center, Inc., and in his personal capacity; PAM FULKS, in her official capacity as President and Chief Executive Officer of Wyoming Medical Center, Inc., and in her personal capacity; VICKIE DIAMOND, in her official capacity as Senior Vice President and Chief Operating Officer of Wyoming Medical Center, Inc., and in her personal capacity; and MARY JANE O'CONNOR, in her official capacity as Head of Perioperative Services of Wyoming Medical Center, Inc., and in her personal capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS WYOMING MEDICAL CENTER AND VICKIE DIAMOND'S MOTION FOR SUMMARY JUDGMENT[1]**

COME NOW the Plaintiffs, by and through their attorneys, Speight, McCue & Crank, P.C., and in response to Defendants Wyoming Medical Center and Vickie Diamond's Motion for Summary Judgment state as follows:

<u>**INTRODUCTION**</u>

Neurosurgery operations involving a patient's spine, spinal cord, or brain are delicate procedures requiring highly trained surgeons and staff. A surgery to repair a ruptured cerebral aneurysm, to remove a deadly brain tumor, or to repair a person's broken or deteriorated spinal column, carry great risks such as stroke, paralysis, and death. Only the best of the best undertake such challenges and risks to provide their patients with a quality of life that has been taken away from them by disease, injury, or the everyday wear and tear of physical strain and labor.

Wyoming Medical Center ("WMC"), prior to their illegal, unconstitutional, spiteful, vengeful, intentional, and negligent actions against Dr. Narotzky, Dr. Kopitnik, Dr. Steele, and Central Wyoming Neurosurgery ("CWN"), had the type of neurosurgical program that few, if any, communities in the United States or the world could boast of. The physicians of CWN, despite the incompetence of WMC officials, administrators and employees, provided world class care to their patients until they were driven from WMC and forced to perform their specialized surgeries elsewhere.

During their tenure at WMC, Dr. Narotzky, Dr. Kopitnik, and Dr. Steele collectively endured negligent staff and incompetent care of their patients by departments of WMC, including ICU which was staffed at times by "floaters" or "travelers"[2] and which resulted in the

---

[1] Plaintiffs also rely on the other responsive briefs filed with regard to Defendants Mike Reid, Pam Fulks, Board of Trustees of Memorial Hospital of Natrona County, and Mary Jane O'Connor.

[2] "Floaters" are generally full time employees of WMC who are assigned on a daily basis to cover nursing shortages in various departments of the hospital. "Travelers" are rented nurses hired on a contract basis to fill gaps in nursing care for a set period of time. *See* **Appendix 16**, Cann deposition at pp. 13-14; 21.

unnecessary death of patients which likely would have survived but for the negligence of WMC. Julie Cann, WMC Associate Vice President of Nursing, has admitted in her deposition that the use of a "floater" or "traveler" in ICU to care for a neurosurgery patient resulted in harm to a patient.  *See* Plaintiffs' Appendix to Responses to All Defendants' Motions for Summary Judgment and Memoranda in Support Thereof ("Appendix") 16, Cann Deposition, pp. 42-49. Cann further testified that failure of an ICU nurse to recognize a significant increase in urine output in a neurosurgery patient and failure to notify Drs. Narotzky and Kopitnik for as long as four or five hours harmed a patient.  *Id.* at pp. 50-60.  While Ms. Cann could not recall whether either patient died as a result of these nursing errors, Dr. Kopitnik and Dr. Narotzky will testify that both patients died.  *See* **Appendix 110**, Plaintiffs' Designation of Expert Witnesses at pp. 2-14.

After years of effort by Dr. Narotzky to obtain qualified nursing support in the operating room; in July, 2004, WMC entered into an exclusive contract with CWN to allow CWN to recruit, hire, and employ their own group of specialized nurses and assistants to assist them in the complicated and highly specialized surgeries performed on a daily basis by CWN surgeons. Less than a year later – and as punishment for Dr. Kopitnik questioning patient care at WMC during a meeting with the Editorial Board of the *Casper Star-Tribune* – WMC took this critical, necessary and lifesaving tool away from the CWN surgeons.  WMC characterized the removal as a "business decision."  *See* **Appendix 89**, Deposition Exhibit O'Connor 2.  This "business decision" has cost WMC and the citizens of Natrona and surrounding counties millions of dollars of lost CWN revenue and expenses and costs associated with the recruitment and employment of Joe Sramek and a subsequent partner by WMC.[3]

WMC's hostile and intolerable working environment foist upon Dr. Kopitnik, Dr. Narotzky, Dr. Steele, and CWN also involved the adoption of an illegal, punitive "economic conflict of interest" policy which would have stripped the CWN physicians of their privileges at the hospital if they would have invested in any type of entity which competed against WMC.

---

[3] Confidential documents first produced by WMC on March 9, 2009, show that WMC, while losing up to $2.7 million dollars of net income (after all expenses) per year after driving CWN from the hospital, has consistently lost money pursuant to their employment of Dr. Sramek and his subsequently recruited partner Dr. Weider.  These losses are detailed in **Confidential Appendix 34**, Confidential Exhibit 1.

*See* Plaintiffs' Confidential Appendix to Responses to All Defendants' Motions for Summary Judgment and Memoranda in Support Thereof ("Confidential Appendix") 6, Deposition Exhibit 134. Elise Brennan, the WMC medical staff attorney and designated expert witness for WMC, has admitted that it is likely that removal of any medical staff member's privileges pursuant to the Economic Conflict of Interest Policy would have violated Section 6.1 of the WMC Medical Staff By-Laws which explicitly prohibits "the termination, granting, continuation, or modification of medical staff privileges based on economic criteria unrelated to clinic qualifications, professional responsibilities, or quality of care …" *See* **Appendix 15**, Brennan Deposition, pp. 147-152. WMC's hostile and intolerable working environment foist upon CWN physicians included a sham and biased peer review against Dr. Kopitnik which violated numerous sections of the WMC bylaws and which was conducted by biased and prejudiced members and committees of the medical staff. *See* **Appendix 5**, Affidavit of Howard L. Lang, M.D.

The intolerable working environment, directed and controlled by WMC, became even worse as September and October, 2005, unfolded. On October 27, 2005, Defendant Mary Jane O'Connor compromised the sterile surgical conditions on two different occasions in both operating rooms being used by Dr. Kopitnik and Dr. Steele. *See* **Appendix 24**, Kopitnik 12/22/08 Deposition, pp. 430-433; **Appendix 38**, Steele Deposition, pp. 12-13; **Confidential Appendix 13**, O'Connor Deposition Exhibit 14; **Confidential Appendix 14**, O'Connor Deposition Exhibit 15; **Confidential Appendix 15**, O'Connor Deposition Exhibit 16. Defendant O'Connor apparently objected to towels being placed over operating room windows to prevent individuals passing by the outside of the operating rooms from observing naked and sedated patients in the operating rooms.

On October 27, 2005, WMC allegedly agreed to try to mediate their differences with CWN and Drs. Narotzky, Kopitnik, and Steele. The WMC Board of Directors designated WMC's mediation team to be Pam Fulks, Vicki Diamond, Mary Jane O'Connor, John Bailey, M.D., and Tom Cunningham, M.D. Pam Fulks has admitted that all members of the mediation team had a strained relationship with CWN. *See* **Appendix 20**, Fulks 09/15/08 Deposition, pp. 160-163. In fact, Mary Jane O'Connor had engaged in the towel incident disrupting CWN

surgeries the very day of the mediation.  *Id*. at p. 161.  Tom Cunningham, M.D., who was on the mediation team, had a conflict of interest because he would financially benefit from owning the only imaging center in town if the mediation failed and CWN was run out of town.  *Id*. at 162. Pam Fulks, when questioned about the conflicts, bias, and prejudice of the mediation team, blamed it on the Board of Directors.  She stated: "the board appointed who would be there, not me."  *Id*. at p. 162.  It surprised no one that the mediation failed.  Over the next four days after the mediation, the intolerable conditions at WMC grew by orders of magnitude.

On October 30, 2005, Defendant O'Connor had WMC contract security guards posted at the operating room doors to surveille CWN physicians and staff.  *See* **Appendix 67**, Deposition Exhibit 159.   On October 31, 2005, Defendant O'Connor reported to the Casper Police Department that Dr. Kopitnik and CWN staff had stolen thousands of dollars of neurosurgery equipment from the hospital and supplied the Casper Police Department with a videotape which she claimed showed Dr. Kopitnik committing the theft.  *See* **Appendix 65**, Deposition Exhibit 152.  After conducting an objective analysis, Michael Blonigen, the Seventh Judicial District Attorney who reviewed the Casper Police Department investigation, concluded that:

> …it is my opinion that no evidence sustaining a charge of theft against any member of Central Wyoming Neurosurgery exists.  In fact, there is no evidence of substance that a theft of medical supplies has been committed by anyone at the Wyoming Medical Center.  Rather, it appears that most of the missing items have been accounted for at this time.  In addition, controls over the quantity of supplies used and consumed is so incomplete that it would be impossible to document if such items were taken and by whom.

* * *

> At the beginning of the investigation, a video was identified which was stated to document the alleged theft.  A review of the video shows that none of the listed suspects had stolen anything from the premises.  One suspect listed in the original report, Dr. Kopitnik, only had a Styrofoam cup in his hand.  Other staff members had portions of a computer.  Everyone agrees that the computer belonged to Central Wyoming Neurosurgery.  Dr. Narotzky, who is not even listed as a suspect, had a box.  In an interview, Dr. Narotzky stated what the property was. Subsequent interviews of Wyoming Medical Center personnel confirmed the items listed were property of Dr. Narotzky or his firm.

*See* **Appendix 64**, Deposition Exhibit 151.

WMC and Defendant O'Connor failed to inform the Casper Police Department that they had been surveilling CWN surgeons and staff for over 30 hours before the theft report and had actually broken into the CWN surgeons' and staff's lockers without a warrant or consent and found no stolen equipment[4] approximately two hours before Defendant O'Connor made the false police report. The intentional failure to disclose this highly exculpatory information to the Casper Police Department while fingering Dr. Kopitnik and CWN staff as thieves and criminals was outrageous, outlandish, unconstitutional and a clear violation of our clients rights.

The WMC created nightmare was, however, not quite over for Dr. Narotzky.[5] On November 2, 2005, Dr. Narotzky responded to the hospital to treat a patient with an acute, herniated, subdural hematoma. The rent-a-nurses ("travelers") hired by WMC to replace the highly competent and skilled operating room team banned from the hospital by WMC's "business decision" refused to transport the patient to the operating room at Dr. Narotzky's order until Mary Jane O'Connor arrived on the scene to observe the surgery. In Dr. Narotzky's opinion, the approximately one hour delay between his direction to take the patient to the operating room (*see* **Confidential Appendix 17**, at CWN 28667-28668) and Defendant Mary Jane O'Connor's arrival at the hospital was a contributing factor in the patient's death. Dr. Narotzky testified:

> [Mary Jane O'Connor] contributed nothing to the care of that patient except to stand in the corner and watch the whole damn fiasco with them trying to figure out how to put a craniotome together. Now, if that isn't creating a hostile working environment, I don't know what is.

*See* **Appendix 27**, Narotzky 09/30/08 Deposition, p. 89. *See also*, **Appendix 92**, O'Connor Deposition Exhibit 24; **Appendix 110**, Plaintiffs' Designation of Experts at pp. 2-14. Pam Fulks

---

[4] Vickie Diamond recalled that only shoes were found in the CWN lockers. *See* **Appendix 18**, Diamond 9/3/08 Deposition at p. 264.

[5] Dr. Steele, who continued to cover trauma call after October 31, 2005, was likewise the subject of hostile, retaliatory actions by WMC. On November 4, 2005, Dr. Steele was accused of violating EMTALA by transferring a patient with a ruptured aneurysm to Salt Lake City. On November 9, 2005, Dr. Steele was accused of failing to respond to a trauma call. *See* **Appendix 105**, WMC 3049-3050; **Appendix 38**, Steele Deposition, pp. 26-34. Both of these allegations were found to be false.

later reported falsely to the Board of Trustees of Natrona County of Memorial Hospital that the first surgery using the rent-a-nurses went well.  Ms. Fulks stated:

> The one emergency case that Dr. Narotzky had, he came in on a subdural, and he took the patient to the OR and it was the first one since they said they weren't coming, and it was with our team, and he had never worked with any of them because they were all travelers and so OR director got called.  So she came in.  It was like 3:30 in the morning, and so she came in just to see if the case went well, you know, that everybody knew what they were doing, and you know, just to be there to help.
>
> And he felt like he was under surveillance because she stood in the room, and he said he would consider that harassment, and I thought – I mean, I complimented her.  I said that's awesome that she got up in the middle of the night and came in just to make sure it went well.  **And it went great.**

*See* **Appendix 41**, Board of Trustees of Memorial Hospital of Natrona County November 15, 2005, meeting transcript, p. 31.  Ms. Fulks also lied about WMC having posted guards at the doors to the operating rooms.  When asked whether WMC had guards at the operating room doors, Fulks responded, "No, absolutely not correct."  *Id.* at p. 30.  **Appendix 67**, Deposition Exhibit 159, shows that guards were posted at the doors evidently from 10:00 a.m. on October 30, 2005, through sometime on October 31, 2005.

Having at that point been subjected to a sham and biased peer review in direct violation of the WMC Medical Staff Bylaws; having been denied the OR support personnel necessary to provide quality care to their patients; having personally experienced at least four patient deaths because of the negligence and incompetence of WMC and its administration, having been falsely accused of being thieves and criminals; having had their lockers searched in direct violation of the Wyoming and United States Constitutions; having been singled out and having been treated differently than other members of the medical staff with regard to peer review, physician discipline, and the economic credentialing policy, Drs. Narotzky, Kopitnik, and Steele firmly believed that the working environment at WMC was so hostile and intolerable that they had no choice but to resign their privileges.  Dr. Narotzky phrased it best:

> The straw, in my mind, was when the hospital broke into our lockers, because my fear was the next step is that someone is going to plant fentanyl or cocaine or

> something in my locker, and if that happens, I am going to lose my medical
> license.  And that was not something I was going to risk happening.

*See* **Appendix 27**, Narotzky 09/30/08 deposition, p. 88.

The fact that the hospital was dead set on running the physicians out of the hospital was not just a figment in the imagination of Drs. Narotzky, Kopitnik, and Steele.  On October 19, 2005, Defendant Mike Reid informed the WMC Board of Directors that Dr. Kopitnik was refusing to operate with the travelers (rent-a-nurses) hired by WMC to replace the operating room team.  Defendant Mike Reid, WMC Board of Directors Chairman advocated threatening CWN physicians with immediate revocation of their hospital privileges.  Dr. Tom Cunningham, a direct competitor of CWN in the Natrona County medical imaging business and a member of the Peer Review Committee who "investigated" Dr. Kopitnik, was overjoyed with the news.  Dr. Cunningham e-mailed back to his fellow Board members: "[i]mmediate suspension of privileges is not only prudent but necessary."  *See* **Appendix 50**, Deposition Exhibit 40.  Later in the afternoon of October 19, 2005, Dr. Cunningham stated: "That is the best news I have heard in a long time regarding CWNS! …  Let the recruiting begin."  *See* **Appendix 47**, Deposition Exhibit 36.  As early as March 28, 2005, Mike Reid had stomped out of a meeting with the CWN physicians proclaims: ""F--- it, I don't have to sit here and take this, we are done …"  *See* **Appendix 43**, Deposition Exhibit 21.  His intent as of October 19, 2005, was clearly expressed when he told his fellow Board members, "…sooner or later we will have to stand together and tell them to go to hell."  *See* **Appendix 51**, Deposition Exhibit 42.

Defendants' spite, animus, and desire to drive the CWN physicians out of the hospital are further evidenced by other actions of WMC, the Board of Directors, and hospital administration.  On October 5, 2005, Pam Fulks reported to Mike Reid that:

> …just wanted you to be aware that Dick [Williams, hospital internal counsel], Ed
> [Renemans, hospital Chief Financial Officer], Vickie [Diamond, Chief Nursing
> Officer], and I have decided to wire the two CWN rooms to monitor
> conversations.  This is being done as a defense mech[anism] because we are
> getting back some damaged equipment that seems to be intentional.  We'll make
> sure we are within our legal rights.  We're not sharing this with anyone else.

*See* **Appendix 60**, Deposition Exhibit 93.  (Bracketed material added.)  Having been advised that the senior leadership and the lawyer of WMC were proposing to engage in the illegal wiretapping of the CWN physicians and staff, the Chairman of the Board of Directors Mike Reid's, only inquiry was whether they could videotape, as well as record, conversations.  *Id*. Pam Fulks responded that she was checking to see if they could videotape, as well as record, without the knowledge of CWN physicians and staff.  *Id*.

WMC actions, even after CWN physicians resigned their privileges, show how hostile and intolerable the work environment was at WMC.  On December 15, 2005, the Natrona County Commissioners held a public meeting to allow the community to express their opinions regarding the dispute between CWN and WMC.  A number of persons signed in to speak at this public meeting in support of CWN and Drs.  Narotzky, Kopitnik, and Steele.  *See* **Appendix 70**, Deposition Exhibit 216.  WMC has produced documents, left behind when Ms. Fulks left the employ of WMC in what was identified as the "Pam Fulks box," that conclusively show that someone[6] at WMC accessed confidential medical records of nine persons who spoke at the Natrona County Commissioners public meeting.  Confidential patient medical information concerning dates of admission, dates of discharge, and treating physicians of citizens who spoke favorably towards CWN and its physicians were obviously accessed and compiled.  *See* **Appendix 71**, Deposition Exhibit 217.  The outrageous violation of WMC's patients private and confidential medical records because these patients dared to speak positively regarding CWN at a community meeting graphically illustrates WMC's extent and scope of their hatred and vindictive actions regarding Drs. Narotzky, Kopitnik, and Steele.  While Fulks denied any personal knowledge of personal complicity in this invasion of confidential patient matters, Fulks did admit to using hospital staff on November 1, 2005, to research the background of individuals who wrote letters to the editor critical of WMC or in support of CWN.  *See* **Appendix 75**, Deposition Exhibit 228; **Appendix 20**, Fulks 09/15/08 deposition at pp. 178-180.

---

[6] Pam Fulks was evasive when asked whether she would direct someone to investigate patient records of people who spoke at a public meeting.  Pam Fulks testified that she did not "think" she would have directed such an action, but could not recall for certain.  *See* **Appendix 20**, Fulks 09/15/08 Deposition, p. 110-111.  Fulks could not identify who may have created **Appendix 71**, Deposition Exhibit 217.

Drs. Narotzky, Kopitnik, and Steele were subjected to as hostile and intolerable environment that a physician could possibly imagine.  They had no choice but to resign their privileges and find another hospital to help their patients.  On November 17, 2005, they delivered their resignation of privileges to WMC and thereafter began performing surgeries at Cheyenne Regional Medical Center while maintaining their clinic in Casper, Wyoming.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when there is no genuine issue of material fact to be resolved at trial.  F.R.Civ.P 56(c); Nebraska v. Wyoming, 507 U.S. 584, 590 (1993).  Thus, a district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." F.R.Civ.P 56(c); *Nelson v. Geringer*, 295 F.3d 1082, 1086 (10th Cir. 2002).  "An issue of material fact is genuine where a reasonable jury could return a verdict for the party opposing summary judgment." *Seymore v. Shawyer & Sons, Inc*., 111F.3d 794, 797 (10th Cir. 1997).

In applying these standards, the district court will view the evidence in the light most favorable to the party opposing the summary judgment. *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996).  The movant bears the initial burden of demonstrating the absence of evidence to support the non-moving party's claims.  *Celotex Corp. v. Catreett*, 477 U.S. 317, 325 (1986).  When the non-moving party bears burden of proof at trial, the burden then shifts to it to demonstrate the existence of an essential element of its case.  *Id*.  To carry this burden, the non-moving party must go beyond the pleadings and designate specific facts to show there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986); *Ford v. West*, 222 F.3d 767, 774 (10th Cir. 2000).

## STATE ACTOR

In order to be liable under 42 U.S.C. § 1983, a Defendant must be a state actor.  In *Moore v. Wyoming Medical Center*, 825 F.Supp. 1531, 1540-1541 (D. Wyo 1993), your honor found that WMC was a state actor and acted under color of state law.  In *Ripley v. Wyoming Medical Center,* Case No. 06-CV-091J (D. Wyo. Feb. 1, 2008) (Order on Plaintiff's Motion for Partial Summary Judgment at 13) Judge Johnson found WMC to be a state actor and acting under color

of state law.  *See also*, *Nieto v. Kapoor*, 1998 U.S. Dist. Lexis 22490 (D.N.M. Sept. 17, 1998) ("A hospital run by a private entity but created by a city and leased to a hospital authority was a state actor for purposes of a § 1983 claim.")

Defendants Reid, Fulks, and O'Connor have failed to present any argument or challenge to the fact that WMC is a state actor for purposes of this § 1983 claim.  Defendants WMC, Vickie Diamond and the Board of Trustees of Memorial Hospital of Natrona County have admitted in their briefs in support of their motions for summary judgment that WMC is a state actor.  *See* Brief in Support of Motion for Summary Judgment of Defendant Board of Trustees of Memorial Hospital of Natrona County at 11-12; WMC Inc. and Vickie Diamond's Brief in Support of their Motion for Summary Judgment at 24, Footnote 17.

Based on the admissions of the Defendants and controlling case law in this District and Circuit, the Court must find that WMC is a state actor and acted under the color of state law for purposes of Plaintiffs' claims in this matter pursuant to 42 U.S.C. § 1983.

## VESTED PROPERTY INTEREST

The Plaintiffs had a vested property interest in the privileges granted to them by WMC.  To establish a constitutional violation, there must be a two-part finding.  First, it must be determined that Plaintiffs have a protected property interest in their hospital privileges; then it has to be determined whether they have been deprived of their property interest without due process of law.  "In order to prevail on a procedural due process claim, a plaintiff must demonstrate: (1) the deprivation of a liberty or property interest and (2) that no due process of law was afforded."  *Stears v. Sheridan County Mem*. Hosp. Bd. of Trs., Order on Cross Motions for Summary Judgment, Case No. 04-CV-223-D (D. Wyo. 2005) (citing *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1253 (10th Cir. 1998); *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)).

Whether a physician has a property interest in his staff privileges at a public hospital is a question that has not been squarely answered by Wyoming courts, either state or federal.  However, the Wyoming Supreme Court has held that a doctor has a constitutionally protected property right in his license to practice medicine.  *Garrison v. Board of Trustees of Memorial Hosp.*, 795 P.2d 190, 193 (Wyo. 1990); citing *Paravecchio v. Memorial Hospital of Laramie*

*County*, 742 P.2d 1276, 1283 (Wyo. 1987) ("Moreover, the right to practice medicine, while it is a property right, is conditional and subject to the police power of the state").  From there, it is a natural progression to find that clinical privileges at a public hospital, once granted, can only be divested by a process that comports with the requirements of the 14th Amendment and with Article 1, Section 6 of the Wyoming Constitution.[7]  *Edwards v. Fresno Cmty. Hosp., 113 Cal. Rptr. 579, 581* (Cal. Ct. App. 1974) ("If the right to practice medicine is a property right, it necessarily follows that the right of a qualified doctor to use hospital facilities to practice surgery and gynecology also involves a property right.  It is well recognized that a hospital's refusal to permit a physician or surgeon to conduct his practice in the hospital, as a practical matter, could have the effect of denying him the right to fully practice his profession").  While the Wyoming Supreme Court has said, "A physician does not have an *unqualified* right, constitutional or otherwise, to practice his profession in a public hospital…a physician may not be excluded by rules, regulations or acts of the hospital's governing authorities which are unreasonable, arbitrary, capricious, or discriminatory."  *Garrison v. Board of Trustees of Memorial Hosp.*, 795 P.2d 190, 193 (Wyo. 1990) (internal citations omitted and emphasis added).  Thus, *Garrison* stands for the proposition that staff privileges are a constitutionally protected property right which is qualified by such standards as the Wyoming Board of Medicine rules and regulations and reasonable hospital medical staff bylaws may provide.

The Tenth Circuit in *Setliff v. Memorial Hospital of Sheridan County*, 850 F.2d 1384, 1395-1396 (10th Cir. 1988), a case deciding whether the hearing requirements of due process were required while a medical staff committee **investigated** a doctor with staff privileges, stated that:

> Setliff argues that since the Hospital's By-laws, Rules and Regulations recognize "the necessity for cause to limit privileges and the right to a hearing," he has the requisite property interest.  Defendants *concede* that Setliff's medical staff privileges are a property interest subject to due process protections. Setliff was

---

[7] The Fourteenth Amendment to the United States Constitution provides, in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law. . . ."

Article 1, Section 6 of the Constitution of the State of Wyoming provides: "No person shall be deprived of life, liberty or property without due process of law."

provided with a hearing conducted in accordance with the Wyoming Administrative Procedure Act prior to the decision to require him to get a second opinion before performing certain procedures.

The Tenth Circuit ultimately held that Dr. Setliff did not have to be awarded due process protections during the **investigative** portion of medical staff review of his actions. However, the opinion in *Setliff* implicitly finds that the hearing and notice requirements of procedural due process and the "comport with justice" requirement of substantive due process be afforded a physician with staff privileges at a public hospital, before he is divested of those privileges by a judicial arm of the hospital's medical staff.

In *Stears v. Sheridan County Mem. Hosp. Bd. of Trs.*, 491 F.3d 1160 (10th Cir. Wyo. 2007) Judge Downes found that it was "fairly clear" that Dr. Stears had a property interest in his public hospital privileges. The Tenth Circuit did not need to address this issue in *Stears*, however, and has yet to definitively rule on this issue.

Although the term "staff privileges" general connotes personal activity and personal rights, the essential nature of a qualified physician's right to use the facilities of a hospital is a property interest. *Edwards v. Fresno Cmty. Hosp.*, 113 Cal. Rptr. 579, 580 (Cal. Ct. App. 1974). The essence of a property interest is an independent state created right, that gives rise to the presumption that a doctor can only lose his clinical rights "for cause." A property interest "is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Pfenninger v. Exempla, Inc.*, 116 F. Supp. 2d 1184, 1195 (D. Colo. 2000); (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, (1982). The existence of a property right depends largely upon the extent to which a statute or governing bylaws contains mandatory language that restricts the discretion of the decision maker. "If the decision to confer a benefit is unconstrained by particularized standards or criteria, no entitlement exists." *Id.* (quoting *Allen v. City of Beverly Hills*, 911 F.2d 367, 370 (9th Cir. 1990)). Whether the facts establish the existence of a property interest is a question of law. *Tarabishi v. McAlester Reg'l Hosp.*, 827 F.2d 648, 652 (10th Cir. 1987).

It is thus generally established in the Tenth Circuit that procedural protections do not, **in and of themselves**, establish a protected property interest. An analysis of the procedural

provisions must occur to determine if the procedural provisions place substantive restrictions or the employer's discretion.  See *E.G. Asbill v. Housing Authority of Choctaw Nation*, 726 F.2d 1499, 1502 (10th Cir. 1984) and cases cited therein.

The WMC Medical Staff Bylaws clearly provide that a member of the medical staff can only be discharged from the medical staff for cause concerning some failure to provide quality patient care or violation of the Bylaws themselves.  The bylaws, themselves, conclusively establish that Drs. Narotzky, Kopitnik, and Steele had a vested property interest in the privileges granted to them by WMC.[8]

Section 3.1 of the WMC Medical Staff Bylaws provides that "every qualified person who seeks or enjoys medical staff membership must continuously meet and demonstrate to the satisfaction of the medical staff and Board the qualifications, standards, and requirements set forth in these bylaws.  *See* **Appendix 52,** Deposition Exhibit 45 at § 3.1, p. 3.  Only physicians which meet the qualifications specifically delineated in Section 3.2-1, which include licensure, experience, education, training, "good judgment," ethical adherence to physician standards, etc, shall qualify for membership.  *Id*. § 3.3.  WMC Medical Staff Bylaws delineate "ongoing responsibilities" of the medical staff to include, among other duties, providing patients with quality patient care, "abiding by the Medical Staff Bylaws, Medical Staff Rules and Regulations, and Medical Staff policies," abiding by the lawful ethical principles of the medical profession and to not commit unprofessional acts under Wyoming law, or to commit any acts sanctionable under state or federal law.  *Id*. § 3.3 at pp. 3-4.  Section 3.3 provides an extensive list of behaviors and acts that any member of the medical staff must do and cannot do.  Section 5.2 of the Medical Staff Bylaws delineates "Right and Duties of Appointees" to the medical staff and states:

> Appointment to the Medical Staff shall confer on the appointee only such Clinical
> Privileges as have been granted by the Board and shall require that each appointee

---

[8] Defendants WMC and Vickie Diamond's designated hospital by-laws expert, Elise Brennan, admitted that a medical staff member at WMC could not be stripped of his/her privileges except for cause, i.e. some violation of the Medical Staff By-Laws involving quality of patient care concerns.  *See* **Appendix 15**, Brennan Deposition, pp. 84-86.  This admission by Defendants' expert establishes that the Plaintiffs had a vested property interest in the privileges they held at WMC.

> assume such reasonable duties and responsibilities as the Board or the Executive
> Committee shall require.

*Id*. § 5.2 at p. 13.

Chapter 11 of the Medical Staff Bylaws clearly and unequivocally provides that medical staff membership cannot be taken away except for cause, i.e. some violation of the Medical Staff Bylaws.   Section 11.1 delineates the procedures that must be followed to even begin an investigation to impose "corrective action" against a member of the medical staff.   There must be a written request for an investigation with supporting references to "specific activities and conduct alleged."   *Id*., § 11.2.   It is patently obvious that if membership on the medical staff could be stripped for any reason at all such as, for instance, having red hair, there would be absolutely no need for the request for investigation to include "specific activities or conduct alleged."

After a proper request for investigation, the Medical Executive Committee is charged with determining whether an investigation is warranted, and if so, ordering an investigation.   *Id***.,** § 11.1-3 at pp. 39-40.   Once again, why would the Medical Executive Committee screen the request for investigation if medical staff privileges could be stripped for any arbitrary and capricious reason?

Section 11.1-4 of the Medical Staff Bylaws provides that "[a]s soon as practicable after the conclusion of the investigation, the Executive Committee **shall** take action which may include, without limitation…" a variety of "corrective actions" ranging from no action at all if "there was no credible evidence of the complaint in the first instance" to recommending the removal, reduction, or suspension of privileges altogether.   *Id*. § 11.1-4 at p. 40   Thereafter, pursuant to Section 11.1-5 of the Medical Staff Bylaws, any decision for corrective action must be transmitted to the hospital Board of Directors for their approval or rejection.   *Id*. § 11.1-5 at p. 41.

In addition, any member of the medical staff who suffers an "adverse action"[9] can demand, and must be supplied with, a full blown due process hearing. The Medical Staff Bylaws explicitly provide that a member of the medical staff must exhaust all remedies afforded by the bylaws before resorting to legal action. *Id.,* § 12.1-1 at p. 45. The hearing to review a potential adverse action must accord the medical staff member notice of the charges including the "acts or omissions" committed by the medical staff member, *Id.*, § 12.3-1 at p. 47-48, the right to counsel, the right to discovery, the right to a fair and unbiased hearing panel or hearing officer, and at the conclusion of the hearing, a decision based on the preponderance of the evidence including a concise statement of the reasons in support of the decision including findings of fact. *Id.* Chapter 12; § 12.4-8 at p. 52-53. Thereafter, the member of the medical staff has very specifically delineated and defined appeal rights with regard to the findings, conclusions, and punishment. *Id.*

It cannot be denied that the WMC Medical Staff Bylaws provide for more than just "procedures." This very detailed set of rules governing the granting, regulation, and withdrawal of privileges at WMC clearly and unequivocally provides for removal of privileges only for just cause. The bylaws themselves provide a "legitimate claim of entitlement" in an ability to maintain privileges at WMC **but for** some violation of the bylaws themselves. See *Re Board of Regents v. Roth*, 408 US 564 (1972). The plaintiff's legitimate claim of entitlement to their privileges at WMC "arose from independent sources" including the WMC Medical Staff Bylaws themselves. *Id. See also*, **Appendix 15**, Brennan deposition, pp. 72-81.

A comparison of the procedural rules found by the *Choctaw* court to not give rise to a protected property interest to the WMC Bylaws confirms this result. In *Choctaw*, the Personnel Grievance Procedure, which the plaintiff claimed gave rise to a vested property interest, basically granted a review hearing of employment decisions made by an executive director. At the conclusion of the hearing, the review board could grant the employee a two week notice of intended dismissal. 726 F.2d at 1502. There were no provisions in *Choctaw* that delineated

---

[9]   An adverse action, by reference to federal law, is defined as any action which reduces, restricts, suspends, revokes, denies, or fails to renew a member's medical staff privileges. *See* **Appendix 52**, § 12.2-2(m) of WMC Medical Staff Bylaws at p. 47 and 42 U.S.C. § 11151(1).

duties and obligations of the employee, "corrective action" procedures, standards governing findings of the review board, etc., such as are provided by the WMC Bylaws.  As the court noted

> . . . procedural protections alone do not create a protected property right in future employment; such a right attaches only when there are substantive restrictions on the employers discretion.  For example, if a statute, regulation, or policy specifies the grounds on which an employee may be discharged, or restricts the reasons for discharge to "just cause shown," then the employee has a right to continued employment until such grounds or causes are shown.

*Id.*  The WMC Bylaws set forth not only the duties and obligations of medical staff membership but also a very detailed and comprehensive procedure that must be followed for removal of privileges from a medical staff member who fails to fulfill the duties and obligations of the bylaws.  The WMC Bylaws impose substantive restrictions on the discretion of the Medical Executive Committee, the WMC Board of Directors, and the hearing panel or officer from the outset of the complaint through the final appeal.[10]

The WMC Bylaws themselves conclusively establish that Drs. Narotzky, Kopitnik, and Steele had a vested property interest in their privileges at WMC.  To argue otherwise is to claim that the privileges could have been revoked for any arbitrary and capricious reason such as the hair color of the medical staff member.  Obviously, such an action could not occur under the WMC Medical Staff Bylaws which conclusively demonstrate the vested property interest possessed by the Plaintiffs.

Numerous United States Circuit Courts of Appeal have held that "staff privileges guaranteed by state law at a state hospital are a property interest protected pursuant to the Due Process Clause of the Fourteenth Amendment."  *Greenwood v. Office of Mental Health*, 163 F.3d 119, 122 (2d Cir. 1998)(citing  *Lowe v. Scott*, 959 F.2d 323, 335-36 (1st Cir. 1992);  *Darlak v. Bobear*, 814 F.2d 1055, 1061 (5th Cir. 1987);  *Yashon v. Hunt*, 825 F.2d 1016, 1022-27 (6th Cir. 1987), cert. denied, 486 U.S. 1032, 100 L. Ed. 2d 602 , 108 S. Ct. 2015 (1988); *Setliff*, 850 F.2d at 1394-95; *Shahawy v. Harrison*, 875 F.2d 1529, 1532-33 (11th Cir. 1989).  "[T]he 'Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a

---

[10] Based on the admission of Defendants medical staff by-laws expert, there can be no dispute of these facts and the fact that Plaintiffs had a vested property interest in their privileges at WMC.  *See* **Appendix 15**, Brennan Deposition, pp.72-81

person has already acquired in specific benefits.'"  *Lowe*, 959 F.2d at 335 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 576, 33 L. Ed. 2d 548, 561, 92 S. Ct. 2701, 2709(1972)).  The First Circuit in *Lowe*, discussed decisions from other Circuits dealing with a property interest in hospital staff privileges with an emphasis on the 5th Circuit decision in *Northeast Georgia Radiological Assocs., P.C. v. Tidwell*, 670 F.2d 507 (5th Cir. Unit B 1982):

> The Fifth Circuit found that "the contract, incorporating the medical staff by-laws, and the by-laws per se, established 'the existence of rules or mutually explicit understandings,' and sustained [the] claim to a protected property interest."  As the basis for its decision, the *Tidwell* court relied on the Supreme Court's holding in *Perry v. Sindermann*, 408 U.S. 593, 601, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972), that a state college teacher could have acquired a "legitimate claim of entitlement" to continued employment where state officials fostered the understanding that he would not be terminated absent proper cause.  *Perry*, 408 U.S. at 602.

> *Tidwell's* application of *Perry* rests on the proposition that a public hospital creates a property interest within the meaning of *Roth* if, in granting hospital privileges to its staff physicians, the hospital also fosters the understanding that these privileges will not be terminated without some form of process.  Other decisions in the circuit courts have applied a similar analysis. See *Darlak*, 814 F.2d at 1061-62 (public hospital's regulations providing for a hearing prior to termination of staff privileges established property interest); *Yashon,* 825 F.2d at 1022-24 (assuming existence of property interest, and finding that internal hearing procedures established by public hospital satisfied due process); *Setliff*, 850 F.2d at 1395 (while public hospital's requirement of cause to terminate staff privileges may have established property interest, no due process violation shown because pre-termination hearing was provided); *Shahawy*, 875 F.2d at 1532 (applying Tidwell directly). See also *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991) (because physician could not be deprived of staff privileges without just cause, tenure on public hospital's medical staff was property interest).

As the *Lowe* Court thoroughly demonstrates, there is a distinct, settled body of federal case law that clearly holds that medical staff bylaws, very similar to those at issue in the instant case, create a property interest in hospital staff privileges.  Of course it is also settled law that any action which infringes upon a Constitutional right without affording due process of law cannot stand.  See *Westmark v. State*, 693 P.2d 220, 222 (Wyo. 1984).  The Plaintiffs' hospital privileges were clearly a vested property right which could not be taken away without due

process and for cause.   By subjecting the Plaintiffs to an intolerable and hostile work environment, the Defendants have deprived the Plaintiffs of their vested property interest in violation of the U.S. Constitution.

Wyoming state law also recognizes the property interest Wyoming physicians have in privileges granted by a public hospital.   This recognition is found in both the Wyoming Administrative Procedures Act ("WAPA") and the Hospitals, Health Care Facilities and Health Services Act ("HCFHSA").

Pursuant to WAPA, Wyo. Stat. §§ 16-3-101, et. seq., WMC is an agency as defined by WAPA.[11]   Any type of proceeding to remove a physician's privileges would be a "contested case" under the WAPA as if it would be a "proceeding . . . in which . . . privileges of a party are required by law to be determined by an agency after opportunity for a hearing. . . ."[12]   WAPA specifically provides that agency decisions found to be arbitrary or capricious, contrary to constitutional right, privilege or power, or taken without observance of required procedure, must be set aside.   *See* Wyo. Stat. § 16-31-114(c).

Wyoming law, which specifically prevents WMC from acting arbitrarily and capriciously with regard to the Plaintiffs' privileges, once again establishes that privileges at a public hospital in Wyoming are a vested property interest.

The HCFHSA also supports this result.   Under Wyoming law, no health care facility can be licensed unless the facility continuously reviews "professional practices" in the hospital to assure quality patient care, including the "qualifications and professional competence" of persons performing or seeking to perform health care services.   Wyo. Stat. § 35-2-910.   By requiring hospitals in Wyoming to engage in such review to even do business in Wyoming, the Wyoming Legislature has specifically recognized what *Garrison* has long held: ". . . the right to practice

---

[11] W.S. § 16-3-101(b)(i): "(i) "Agency" means any authority, bureau, board, commission, department, division, officer or employee of the state, a county, city or town or other political subdivision of the state, except the governing body of a city or town, the state legislature, the University of Wyoming and the judiciary.

[12] W.S. § 16-3-101(b)(ii) -    (ii) "Contested case" means a proceeding including but not restricted to ratemaking, price fixing and licensing, in which legal rights, duties or privileges of a party are required by law to be determined by an agency after an opportunity for hearing but excludes designations under W.S. 9-2-1022(h)(i).   *See also*, **Appendix 109**, Order Compelling Discovery entered by Judge Guthrie in *Guier v. Teton County Hospital District*, Civil No. 14218, ". . . The Court, having reviewed the pleadings and memoranda filed and having heard arguments of counsel the Court finds that the proceeding to terminate Dr. Guier [sic] privileges is a contested case proceeding under the Wyoming Administrative Procedure Act."

medicine, while it is a property right, is subject to the police power of the state."  795 P.2d at 193.  The right to practice medicine at WMC was likewise a property right, subject to constitutional guarantees, the WAPA, and the "police power" of WMC as specifically delineated in the WMC Medical Staff Bylaws.

Other factors show that the Plaintiffs had a vested property interest in their privileges.  As Judge Downes noted in *Stears*, "the clear weight of authority finds that hospital bylaws are binding contracts between the hospital and medical staff."  *Steers*, Case No. 04-CV-223-D (Order on Cross Motion for Summary Judgment, at p. 29, n. 8.)  A contractual right is clearly a vested property interest of the contracting party for purposes of 42 U.S.C. §1983.  See *Nichols v. Bd. of County Comm'rs*, 506 F.3d 962, 970 (10th Cir. 2007); *Moreland Properties, LLC v. City of Thornton*, 559 F. Supp. 2nd 1133, 1145 (D. Colo. 2008).

The WMC Medical Staff Bylaws themselves clearly show a contract between the Plaintiffs and the hospital.  Section 5.2 provides:

> Appointment to the Medical Staff shall confer on the appointee only such Clinical Privileges as have been granted by the Board and shall require that each appointee assume such reasonable duties and responsibilities as the Board or the Executive Committee shall require.

See **Appendix 52**, Deposition Exhibit 45, § 5.2 at p. 13.

In exchange for clinical privileges, each member of the medical staff "assume[s] … [the] duties and responsibilities … [imposed] by the Board and the Executive Committee."  § 5.2 (bracketed material added).  In exchange, WMC has a qualified medical staff to treat those who seek medical services at WMC and collects millions of dollars in hospital charges.  The necessary components of a valid contract – offer, acceptance, and consideration – are all present in the relationship.  *Finch v. Farmers Co-op Oil Co. of Sheridan*, 109 P.3d 537, 541 (Wyo. 2005).  The Bylaws, themselves, make this abundantly clear by stating, "[t]he Bylaws, when adopted and approved, shall be equally binding on the Board of Directors and the Medical Staff."[13]**Appendix 52**, Deposition Exhibit 45, § 14.5 at p. 65.

---

[13] Dr. Lang, Plaintiffs' designated medical staff by-laws expert, has opined that medical staff by-laws are a binding contract between the medical staff member.  *See* **Appendix 5**, Affidavit of Howard L. Lang, M.D.  Elise Brennan,

The Plaintiffs had a vested property interest in the privileges granted to them by WMC. In fact, the totality of the Defendants' actions during September and October, 2005, are an admission that Plaintiffs had a vested property interest in their privileges that could not be taken away without due process of law.  The hostile and intolerable work environment foist upon Plaintiffs by WMC deprived the Plaintiffs of their vested property right without any of the due process guarantees of the U.S. Constitution or Chapter 12 of the WMC Medical Staff By-Laws. WMC's actions, including false police reports, removal of the OR team, the charade of a mediation involving a biased and conflicted mediation team, the unconstitutional search of the lockers, were all actions by WMC seeking the resignation of privileges **because WMC did not have just cause to take away the Plaintiffs' privileges**.  WMC's concerted efforts to drive the Plaintiffs from WMC are an admission that the Plaintiffs did have a bested property interest in the privileges granted to them by WMC.

## <u>CONSTRUCTIVE DISCHARGE BY CREATION OF AN INTOLERABLE AND HOSTILE WORK ENVIRONMENT</u>

Plaintiffs were constructively discharged from their medical staff privileges at WMC by the acts of all Defendants that led to the creation of an intolerable and hostile work environment in which Plaintiffs were left with no other option but to resign their privileges.

"Constructive discharge occurs when an employer unlawfully creates 'working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.'" *Strickland v. United Parcel Service, Inc.*, 555 F.3d 1224, 1228 (10th Cir. 2009) (*citing Fischer v. Forestwood Co.,* 525 F.3d 972, 980 (10th Cir.2008).  The employer's subjective intent in creating the constructive discharge and the employee's subjective views on the constructive discharge are irrelevant.  *Id.*

**Whether a constructive discharge occurred is a question of fact**.  *Id.* ("The existence of constructive discharge is an issue of fact to be resolved by the jury, and judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation.")  Whether the working conditions for Plaintiffs at WMC were objectively intolerable is a question of fact for a

---

Defendants' expert on this area said she could not reach any opinion on this issue until the Wyoming Supreme Court decided this question.  *See* **Appendix 15**, Brennan Deposition, pp.87-91

jury if Plaintiffs provide sufficient evidence to support a finding of constructive discharge. *Strickland*, 555 F.3d at 1229; *Arnold v. McClain,* 926 F.2d 963, 966 (10th Cir. 1991).

The Board of Trustees of Natrona County is responsible for ensuring that WMC is run in such as manner as to satisfy its statutory mandates.  *See*. W.S. § 18-8-108 (a).  *See also*, **Appendix 40**, Thorson Deposition, pp. 37-39, 42, 144.  An aspect of those mandates is ensuring that medical staff privileges are not discharged or terminated in a manner that violates the Constitutions of either the United States and the State of Wyoming.  G*arrison v. Bd. Of Trustees of Memorial Hospital of Laramie County*.  795 P.2d 190, 193 (Wyo. 1990).  The WMC Board of Directors has the ultimate responsibility for approval, denial, and discharge of physician privileges at WMC, and is therefore ultimately responsible for the constructive discharge of Plaintiffs from their medical staff privileges on November 17, 2005.  *See* **Appendix 13**, Anderson Deposition, pp. 24-26; **Appendix 17**, Chadderdon Deposition, pp. 79-80.

The working environment at any hospital is controlled jointly by the members of the medical staff, the hospital administration, and the Board of Directors.  *See* **Appendix 5**, Affidavit of Howard L. Lang, M.D.; **Appendix 15**, Brennan Deposition, pp. 174-176.  The Board of Trustees of the Memorial Hospital of Natrona County has delegated its statutory control over the day to day operations of the hospital to the WMC Board of Directors via the operating lease entered into between the Board of Trustees and WMC, Inc.  In turn, the Board of Directors of WMC delegates its authority for control of the day to day operation of the hospital to the executive administrative staff of WMC.  *See* **Appendix 52**, Deposition Exhibit 45.  Defendant Fulks, in her position of CEO, was responsible for directing every employee at WMC and for ultimate control of all of the facilities at WMC.  *See* **Appendix 20**, Fulks 9/15/08 Deposition, pp. 75-76.  Defendant Diamond, in her position of COO, was responsible, and had authority over all operational aspects of WMC, including responsibility for the Operating Room, the Emergency Room, the Intensive Care Unit, Central Sterile Processing, and other areas of the hospital where Plaintiffs exercised their privileges.  *See* **Appendix 18**, Diamond 9/3/08 Deposition, pp 14-19. Defendant O'Connor, in her position as head of Perioperative Services, had administrative and supervisory responsibilities for the operating rooms, GI lab, the recovery room, ambulatory surgery as well as Central Sterile Processing at WMC.  *See* **Appendix 29**, O'Connor Deposition,

p. 20-21.  Defendants all, collectively and individually had the authority and responsibility for establishing the working conditions at WMC in which Plaintiffs were required to perform inpatient neurosurgeries.  *Woodward v. Worland*, 977 F.2d 1392, 1402-03 (10th Cir. 1992).  *See* **Appendix 15**, Brennan Deposition, pp. 174-176.  Given that Defendants were responsible for, and had the authority to establish the working conditions at WMC, it was clearly established at the time of Plaintiffs constructive discharge on November 17, 2005 that Defendants are liable for the constructive discharge of Plaintiffs in violation of the Due Process Clause of the Fourteenth Amendment. *Id.  See also*, **Appendix 15**, Brennan Deposition, pp. 201-203.

<u>**Constructive Discharge of an Independent Contractor**</u>

The medical staff of WMC are essentially independent contractors of WMC.  *See* **Appendix 5**, Affidavit of Howard L. Lang, M.D.  There is not a pure employee/employer relationship that existed between Plaintiffs and WMC.  However, while WMC could not explicitly direct members of the medical staff how to treat their patients, there can be no doubt that WMC was, in large part, in control of the working environment and work area.  *See* **Appendix 15**, Brennan Deposition, pp. 201-203.  WMC's own expert admitted that the WMC Board of Directors are ultimately responsible for every aspect of what occurs in a hospital.  *Id.* at pp. 202.  Plaintiffs were highly reliant on Defendants to be able to conduct neurosurgeries in Natrona County.   Defendants supplied Plaintiffs with, among many other necessities: an operating room, critical support staff, the ordering and supply of surgical instruments and equipment, a facility in which to clean and sterilize those instruments, and an intensive care unit for their patients to recover in.  Defendants controlled the decisions whether to provide these resources to Plaintiffs, and also the conditions by which these resources would be supplied to Plaintiffs.  *See* **Appendix 15**, Brennan Deposition, pp. 207-209.

An independent contractor/physician can be constructively discharged from his staff privileges at a public hospital.  In *Smith v. Cleburne County Hosp.,* 870 F.2d 1375 (8th Cir. 1989) the United States District Court for the East District of Arkansas held that "Dr. Smith's medical staff privileges were constructively revoked in retaliation for his engaging in First Amendment protected speech on matters of a public concern." *Id*. at 380 (*citing Smith v. Cleburne County Hospital,* 607 F.Supp. 919, 927 (E.D.Ark.1985)).  The Eighth Circuit agreed

with the United States District Court for the Eastern District of Arkansas that an independent contractor physician could be legally discharged from his medical staff privileges by the actions of the administrators and board of a public hospital. *Cleburne* explicitly found that a physician could be constructively discharged from the vested property interest he possessed in his privileges, but found that Dr. Cleburne had not <u>factually established</u> he had been constructively discharged. *Id*. at 1380.

The Eight Circuit found that "[w]hile there is not a direct salaried employment relationship there is an association between the independent contractor doctor and the Hospital that have similarities to that of an employer-employee relationship." *Id*. at 1381. These similarities include: 1) the application process for privileges; 2) the required duties to be performed by both parties (such as the physicians responsibility to practice medicine at the hospital in accordance with all state and federal regulations, and the hospitals duty to provide the safest, cleanest environment possible for a physician to treat his patients in); 3) and the potential liabilities each party is responsible for jointly and severally for tortuous conduct. *Id*. at 1381. Given the similarities between the independent contractor physician and a public hospital to that of an employer-employee relationship, it is legally irrelevant for the purposes of a constructive discharge claim that Plaintiffs were not employees of WMC. Therefore, the actions of a public hospital can constructively discharge a member of its medical staff if the hospital rendered the medical staff member's working conditions intolerable or was deliberately and intentionally forcing the medical staff member to resign his privileges. *Id.*

The Eighth Circuit is not alone in its determination that a physician can be constructively discharged by a state actor. The United States District Court for the District of Hawaii has held that a independent contractor physician was constructively discharged from his position as a prison physician by the actions of prison officials. *Allen v. Iranon*, 99 F.Supp.2d 1216 (D.Hawai'i 1999) (*aff'd by Allen v. Iranon, 283* F.3d 1070 (9th Cir. 2002).[14]  In *Allen*, The

---

[14] Other courts have found that physicians can be constructively discharged by the actions of a public hospital administration. (*See Ezekwo v. New York City Health & Hospitals Corp*., 940 F.2d 775 (2d. Cir. 1991) (Physician had property interest in becoming chief resident and was denied her property interest without proper process  in violation of 42 U.S.C. § 1983); *Mawaldi v. St. Elizabeth Health Center*, 381 F.Supp.2d 675 (N.D.Ohio 2005)

District Court found that Dr. Allen was "locked out" from the prison facilities by prison officials in retaliation for incidents that should have been handled administratively and without resorting to keeping Dr. Allen completely from his work.  The Court further found that prison officials conducted a number of Internal Affairs investigations into allegations which were not appropriate matters for Internal Affairs and should have been handled administratively, and that Allen was passed over for a promotion without a legitimate reason, despite being qualified and having been recommended by a promotion panel.  *Id*.  The court found that Dr. Allen's speaking out against prison officials to the media and members of the legislature about prisoner abuses at the prison he worked at were a motivating factor in the actions prison officials took to constructively discharge him. *Allen*, *283* F.3d at 1073.

The district court in *Allen* held, and the Ninth Circuit affirmed, that the retaliatory actions of the prison officials constructively discharged Dr. Allen from his position as an independent contractor physician at the prison, even though many of the difficulties Dr. Allen experienced at the prison were partially caused by his own conduct.  *Allen*, 99 F.Supp.2d at 1240. The prison officials were held to be liable under 42 U.S.C.§ 1983  for damages payable to Dr. Allen for his lost wages, emotional distress, humiliation, and embarrassment for their retaliatory actions that led to Dr. Allen's constructive discharge. *Id*.

The United States Supreme Court has held that independent contractors can recover damages under 42 U.S.C.§ 1983 for retaliatory governmental action.  In *Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342 (1996), the Supreme Court affirmed a decision of the Tenth Circuit finding that "an independent contractor is protected under the First Amendment from retaliatory governmental action, just as an employee would be…" *Id.* at 672 (*citing Umbehr v. McClure*, 44 F.3d 876 (10th Cir.1995).  In so holding, the Tenth Circuit in *Umbehr* found that the protection from retaliatory government action is appropriate in instances where an independent contractor functions in a way very similar to employees, such as "an association between [an] independent contractor doctor and [a] Hospital

(Physician's resignation from hospital's residency program was not constructive discharge, where he provided no evidence that his working conditions were intolerable.)

that [has] similarities to that of an employer-employee relationship". *Umbehr*, 44 F.3d at 882 - 883 (*citing Smith*, 870 F.2d at 1381 (8th Cir.1989), *cert. denied,* 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989)).  In such a context the Supreme Court refused to limit Constitutional protections based on a bright-line rule announcing a formulaic distinction between an "employee" and an "independent contractor", that had little basis in the actual day-to-day realities of the work place. *Board of County Com'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 678-79.

The holding of *Board of County Com'r, of  Wabaunsee County* controls Plaintiffs claims in this case.  In *Board of County Com'r, of  Wabaunsee County* an independent contractor was retaliated against for exercising a constitutional protected right when a state actor terminated his contract.  The Court recognized that a plaintiff need not be an employee of a state actor to prevail under 42 U.S.C.§ 1983 for a retaliatory or illegal violation of a protected constitutional right in a constructive discharge/adverse employment context.

The Court in *Board of County Com'rs of Wabaunsee County*  found that there was not a "difference of constitutional magnitude," between independent contractors and employees in the context of retaliatory governmental employment action. *Id*. at 684-85 (*citing in part Lefkowitz v. Turley,* 414 U.S. 70, 83, 94 S.Ct. 316, 325, 38 L.Ed.2d 274 (1973), ("in the context of the privilege against self-incrimination, '[w]e fail to see a difference of constitutional magnitude between the threat of job loss to an employee of the State, and a threat of loss of contracts to a contractor'"); *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 235, 17 S.Ct. 581, 584, 41 L.Ed. 979 (1897) ("Regard must be had, ... in ... cases where constitutional limits are invoked, not to mere matters of form but to the substance of what is required").  The Court also concluded that "[i]ndependent government contractors are similar in most relevant respects to government employees…" *Id*.  Applying these principles to the case before this Court, Plaintiffs relationship with WMC is functionally similar to an employee for the purposes of the constructive discharge of their medical staff privileges in violation of the 14th Amendment to the United States Constitution and 42 U.S.C.§1983.

## CONDITIONS GIVING RISE TO A CONSTRUCTIVE DISCHARGE AT WMC

The working conditions that Plaintiffs were subjected to at WMC were incredibly hostile and intolerable and clearly gave rise to a constructive discharge.  As outlined in this Memorandum, those conditions which gave rise to the creation of a hostile and intolerable work environment at WMC for Plaintiffs include:

1. The biased and sham peer reviews from March of 2004 through April of 2005 and the secret peer review in October of 2005;[15]

2. The Economic Conflict of Interest Policy adopted by WMC in the summer of 2004,  that grandfathered all other physician groups in Casper with existing surgical centers while restricting Plaintiffs' ability to follow suit.  *See* **Confidential Appendix 6**, Deposition Exhibit 134; **Confidential Appendix 1**, Deposition Exhibit 51.

3. Defendant's denial of critical resources necessary for Plaintiffs to exercise their privileges at WMC.

4. The multiple intrusions into Doctors Kopitnik's and Steele's Operating Rooms by an unsterile Defendant O'Connor on October 27, 2005, thereby repeatedly threatening patient safety.

5. The false and defamatory report to the Casper Police Department that Dr. Kopitnik and CWN staff had stolen thousands of dollars of neurosurgery equipment from the hospital including withholding highly exculpatory evidence from the Casper Police Department;

6. The illegal search of Drs. Narotzky's and Kopitnik's lockers, as well as those of CWN staff, in violation of Fourth Amendment, on October 31, 2005; and

7. The death of Dr. Narotzky's patient on November 2, 2005 which is directly attributable to "traveling nurses" employed by WMC refusing to transport the patient to the OR until Defendant O'Connor arrived at the hospital approximately an hour after the patient should have been brought to the OR.

All of these actions, when viewed under the totality of the circumstances, and considering Tenth Circuit constructive discharge precedent, overwhelmingly establish that as of November 17, 2005,

---

[15] Members of the peer review were so biased against Dr. Kopitnik that the peer review afforded him no due process at all. *Levenstein v. Salafsky*, 164 F.3d 345, 351 -352 (7th Cir. 1998) ("fundamentally biased process is not due process.").

Plaintiffs had no other reasonable choice but to resign their medical staff privileges at WMC because of the intolerable work environment that Plaintiffs were subjected to at WMC.

The Tenth Circuit, in *Potts v. Davis County Sheriff's Office*, said that the facts in that case were "a close call" as to whether Mr. Potts was constructively discharged by the actions of the Davis County, Utah, Sheriff's Office.  *Potts*, 551 F.3d at 1194.   There Mr. Potts had been demoted from a Patrol Sergeant to a court security officer after a successful appeal of a disciplinary action of the Davis County Sheriff's Office.  *Id.* at 1190-91.   In addition to his reassignment, Potts also asserted that he was constructively discharged because (1) he could no longer receive differential pay, (2) he was not receiving adequate backup when serving protective orders, (3) he was the subject of an Internal Affairs Investigation of the Sheriff's Office,  and (4) he allegedly received a "death threat" on his work voice mail.  *Id.* at 1191.

If the facts in *Potts* provided the Tenth Circuit with a "close call" in deciding whether a constructive discharge occurred, then the intolerable working conditions that Plaintiffs were subjected to at WMC, including sham peer reviews, the specifically targeted economic conflict of interest policy, hostile working conditions in the operating rooms, the withdrawal of critical resources necessary to perform the difficult and complicated surgeries performed by CWN, the false report of theft to the Casper Police Department, and the illegal searches, clearly establish a constructive discharge.  The work environmental found to be a close call in *Potts* does not even begin to compare to the nightmarishly hostile and intolerable environment foist upon Plaintiffs by WMC.

Defendants make much ado regarding documents created by CWN' office manager, Bill Garden, in an attempt to prove that Plaintiffs' resignations were not voluntary, but were in fact part of an elaborate scheme to get themselves kicked out of WMC so that they could build a competing specialty hospital in Casper.  Defendants additionally assert that the WMC's theft allegations against Plaintiffs, and the illegal locker search are not a proper basis for a constructive discharge because these "events  took place after Plaintiffs began planning to build their own hospital."  *See* Defendants Reid and Fulks Motion for Summary Judgment at 19. Defendants' theories fail for a multitude of reasons, not the least of which is that these theories are not supported by the facts of the case.

Throughout 2005, Bill Garden was exploring a variety of options regarding the future business formation and characteristics of CWN.   *See* **Appendix 24**, Kopitnik 12/22/08 Deposition, pp. 546-549; 527-528.  This was part and parcel of Bill Garden's job description as office manager of CWN. *See* **Appendix 27**, Narotzky 9/30/08 Deposition, pp. 119-220.  Garden would explore and consider a multitude of business opportunities, no matter how unlikely or outlandish.  *Id*.  Most of Garden's schemes were little more than daydreaming, pipedreams, or idle "beer talk" that had little or no basis in reality.  *See* **Appendix 9**, Affidavit of Robert Schlidt, M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.; **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.  Garden focused on the business side of CWN so that the Plaintiffs could focus on their patients. *Id*..  Though Plaintiffs worked closely with Garden in many respects, they were rarely privy to the full universe of Bill Garden's schemes at any one time. *See* **Appendix 24**, Kopitnik 12/22/08 Deposition, pp. 304-305; **Appendix 27**, Narotzky 9/30/08 Deposition, pp. 126-127; **Appendix 36,** Schlidt Deposition, p. 17.

At the same time Garden was contemplating various business opportunities for CWN, Casper physician Dr. Robert Schlidt, began preliminary discussions with Bill Garden, National Surgical Hospital ("NSH") and others, exploring the possibilities of building a specialty hospital in Natrona County.  Plaintiffs were not involved in these preliminary discussions between Dr. Schlidt, Garden, and NSH because: 1) they had no intention of building a specialty hospital in Natrona County in 2005; and 2) if Plaintiffs would have invested in a proposal to build a specialty hospital, they reasonably believed that WMC would have stripped their medical staff privileges per the Economic Conflict of Interest Policy in place at WMC.  *See* **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D. pp. 13-14; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D. **Appendix 9**, Affidavit of Robert Schlidt, M.D., pp. 5-6.

Dr. Schlidt was involved in these preliminary negotiations because he performed few surgeries at WMC, and did not fear losing his medical staff privileges.  *See* **Appendix 9**, Affidavit of Robert Schlidt, M.D., p. 6.  However, there were never any firm agreements or obligations to build a specialty hospital in Natrona County in 2005.  *See* **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D. p. 11; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.; **Appendix 9**, Affidavit of Robert Schlidt, M.D., p. 6.; **Appendix 7**, Affidavit of Mark Orgel.

The first "serious" discussions with regard to the building of Mountain View Regional Hospital did not occur until calendar year 2006.  *See* **Appendix 9**, Affidavit of Robert Schlidt, M.D.

A large majority of Garden's time in the second half of 2005 was spent in an attempt to merge CWN with another Casper physician group or groups in what Garden was referring to as a "super group".  This merger discussion involved numerous meetings, hiring of lawyers, drafting of hundreds of pages of merger documents, advertising, creation of logos, et cetera.  There were also plans afoot for the super group to construct new medical offices in Casper. Ultimately, the merger fell through in late December, 2005, and did not occur.  *See* **Appendix 100**, CWN 35405, 35407-35417, 44732, 45502.  In connection with this "super group" merger, Dr. Schlidt was being courted to build a hospital in the same area of Casper.  *Id*.

When it became increasingly apparent that WMC would not reverse their decision to deny the Plaintiffs their critical operating team in October 2005, Drs. Narotzky, Kopitnik, and Steele began to explore moving their entire CWN practice to Colorado Springs, Colorado.  In furtherance of and in preparation for the move to Colorado Springs, Plaintiffs invested considerable time, effort, and resources into attempting to move their practice.  On November 3, 2005, Dr. Narotzky, Dr. Kopitnik, Dr. Steele, Dr. Hammond, and their spouses and Bill Garden traveled to Colorado Springs, Colorado, to meet with the physicians and administrators of Memorial Hospital in Colorado Springs, Colorado.  *See* **Appendix 96**, CWN 6145; **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D. In the spring of 2006, Hospital officials from Colorado Springs traveled to Casper, Wyoming, further investigate and discuss the feasibility of moving the CWN practice to Colorado Springs. *See* **Appendix 97**, CWN 33178, **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.  Mark Orgel, CWN financial advisor was contacted in November of 2005, to gauge whether he would be willing to assist in the possible negotiations of a contract between CWN and Memorial Hospital in Colorado Springs.  *See* **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D., **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.; **Appendix 88**, Deposition Exhibit 642.  Plaintiffs signed a Confidential Letter of Intent regarding relocation of Colorado Springs on January 6, 2006, and sent a follow-up letter

to Memorial Health Systems on February 17, 2006. *See* **Confidential Appendix 18**, CWN 34992-34993; **Confidential Appendix 19**, CWN 35910-35193.

After it became apparent to Plaintiffs in the spring of 2006 that the move to Colorado Springs was not going to work out, Plaintiffs and Bill Garden began exploring the option of forming a joint venture with Cheyenne Regional Medical Center to form a Neuroscience Institute. These negotiations began in approximately April, 2006, and continued in earnest through approximately February, 2007. As with the "super group" merger discussions, lawyers were retained, draft documents were exchanged and considerable amounts of time, effort and money were expended by Plaintiffs, Cheyenne Regional Medical Center, and the neurosurgeons of Wyoming Spine and Neurosurgery Associates in Cheyenne in an attempt to create a Neuroscience Institute. *See* **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.

Only after negotiations or discussion failed with regard to the move to Colorado Springs did Plaintiff seriously consider investing in, and building, a hospital in Natrona County, Wyoming. *See* **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D. These serious negotiations to build what would eventually become Mountain View Regional Hospital did not begin in earnest with NSH until April of 2006, approximately 5 months after Plaintiffs were constructively discharged from WMC. *See* **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.

All of the time, energy and money would not have been expended by Plaintiffs' on the relocation to Colorado Springs, or the creation of the Neuroscience Institute in Cheyenne if their plan as of November 17, 2005, was, as alleged by WMC and the Defendants in this lawsuit, to build a specialty hospital in Casper, Natrona County, Wyoming. Plaintiffs' actions, both with regard to the "super group" merger and the move to Colorado Springs are absolutely inconsistent with an alleged commitment to build a specialty hospital in Natrona County. *See* **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.; **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 11**, Affidavit of Debra Steele, M.D.; **Appendix 7**, Affidavit of Mark Orgel; **Appendix 9**, Affidavit of Robert Schlidt, M.D.

Given that there were no firm plans on the part of Plaintiffs to invest in a surgical hospital in Natrona County in 2005, Defendants cannot use the schemes and delusion of grandeur which are contained within the Bill Garden documents, to assert that Plaintiffs' voluntarily resigned their privileges on November 17, 2005.  The Bill Garden documents that Defendants' rely on, which outline *possible* courses of action for Plaintiffs apart from WMC, are patently inconsistent with the *actual* course of action followed by Plaintiffs after they were constructively discharged from their privileges at WMC.

Defendants claim that a May 13, 2005, e-mail sent by Bill Garden is somehow related to Plaintiffs' resignation of their privileges at WMC and a secret plan to build a hospital in Natrona County, Wyoming.  *See* Defendant Mary Jane O'Connor Memorandum in Support of her Motion for Summary Judgment, p. 1; O'Connor Appendix A1, Deposition 627; Defendants Reid's and Fulks' Memorandum in Support of their Motion for Summary Judgment, p. 2; Brief in Support of Motion for Summary Judgment of Defendant Board of Trustees of Memorial Hospital of Natrona County, p. 9.  This allegation is based on pure speculation and has no basis in fact.

In the e-mail apparently sent on May 13, 2005, <u>over six months prior to the Plaintiffs' resignation of privileges at WMC</u>, Bill Garden claims that Douglas hospital officials have come up with some idea on how to "trap" WMC officials into doing something CWN wants. Whatever the "trap" was and what action CWN wanted to "trap" WMC into doing are not discussed in the e-mail.  Dr. Narotzky, Dr. Kopitnik, and Bob Kayser, the Chairman of the Douglas hospital board, who were all present at the same dinner conversation where Bill Garden claims that Bob Kayser and Tom Nordwick proposed some "trap" for WMC, have stated in their affidavits that no such conversation ever occurred.  *See* **Appendix 3**, Affidavit of Bob Kayser; **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr. M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.  Bob Kayser, one of the alleged creators of the "trap" states:

> Your Affiant and CEO, Tom Nordwick , did not discuss any aspects of creating a "trap" with regard to WMC and CWN.  Your Affiant has no idea what Bill Garden is referring to in this paragraph and does not believe that such conversations ever occurred.

See Appendix 3, Affidavit of Bob Kayser, p. 3.  Thus, the Bill Garden e-mail of May 13, 2005, is irrelevant.  Bill Garden's reference to some "trap" is apparently just a figment of Bill Garden's imagination.

Even if such conversation did occur, the relationship between the unknown "trap" for some unknown purpose and the Plaintiffs' resignation of their privileges some six months later is pure speculation and defies all logic and common sense.  Defendants have totally failed to explain the relevance of this apparently fictitious conversation involving "traps" other than to engage in wild speculation.

Assuming for the sake of argument that Plaintiffs were seriously considering building a surgical center in Natrona County in 2005, Plaintiffs were still constructively discharged from their privileges on November 17, 2005.  Why would Plaintiffs have voluntarily resigned their privileges on November 17, 2005, when *no* firm commitments to invest in or to build a surgical hospital in Natrona County had been negotiated between Plaintiffs and any party?  Stated another way, if Plaintiffs would have been able to voluntarily choose a date on which to resign from WMC, they would have picked a date that allowed them to continue practicing at WMC until the hospital was constructed and they had another facility in Casper, Wyoming to perform surgeries.

The answer to the forgoing questions are simple:  Plaintiffs did not stay at WMC until the competing surgical hospital was built because they had no plan to build a competing surgical hospital in Natrona County in November 2005.  Plaintiffs were forced to leave WMC on November 17, 2005 by the illegal, unconstitutional, and intolerable actions of Defendants.

It cannot be disputed that there are material facts in dispute whether Plaintiffs' resignation of privileges on November 17, 2005, were voluntary or were forced by the intolerable and hostile work environment created by WMC.  On the one hand, the Defendants argue that they can discern the Plaintiffs' intent in the fall of 2005 via the dreamings and wanderings of Bill Garden via the Bill Garden deposition exhibits.  The Plaintiffs, via their depositions and affidavits filed herewith, have informed the Court that they had no intent to resign their privileges at WMC prior to the nightmarish events of late October and early November, 2005.  The Plaintiffs' actions, including the investment of significant resources, time, and effort in trying to move their entire practice to Colorado Springs are absolutely inconsistent

with the Defendants' allegations that the Plaintiffs' plan was to build their own hospital and that their resignations must have been voluntary.  Based on these contested issues of material fact that are in dispute and viewing the evidence in the light most favorable to the Plaintiffs, the Court cannot find that Defendants are entitled to judgment as a matter of law.  The existence of a constructive discharge is a factual determination, *Strickland*, 555 F.3d at 1229, and this factual determination must be decided by the jury in this matter.

Defendant O'Connor attempts to use the factors from *Yearous* to show that Plaintiffs' resignation was voluntary.  The factors that the Tenth Circuit took into consideration in *Yearous* to determine the voluntariness of a resignation are:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice [s]he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether [s]he was permitted to select the effective date of resignation.

*Yearous*, 128 F.3d at 1356. (citations omitted).  O'Connor also states that another factor the *Yearous* panel considered is whether the employee has given the employer a reasonable timeframe in which to work out the problem.  *Id.* at 1357.  Additional factors that O'Connor attempts to use to assert that Plaintiffs voluntarily resigned there privileges include: "[w]hether the employee actively sought other employment before the resignation" and "[w]hether the employee consulted with an attorney prior to resignation."  *See* Defendant Mary Jane O'Connor's Memorandum in Support of Her Motion for Summary Judgment, p. 24).

*Yearous* is factually distinguishable from the instant case in many ways, not the least of which is that the hospital administration in *Yearous*, was willing to try and alleviate the issues that caused the nurses to resign.  *Yearous*, 128 F.3d at 1355.  An examination of the *Yearous* factors shows that such factors are not applicable to this case or add little to a determination as to whether Plaintiffs were constructively discharged from their privileges.  Factors two and three are illustrative of this point.  Factors two and three ask "whether the employee understood the nature of the choice [s]he was given" and "whether the employee was given a reasonable amount of time in which to choose."  *Yearous*, 128 F.3d at 1366.  These factors would be very applicable

to the situation where an employee was given the option of resigning or being fired and a subsequent examination of whether the resignation was "voluntary," but have no applicability to the facts at hand.  As October, 2005, unfolded, Plaintiffs were subjected to a series of events that became more and more hostile and more and more outlandish as the month wore on. Considering whether Plaintiffs chose the date of their resignation or understood the nature of the choice adds little or nothing to the analysis of whether they were subjected to an intolerable working environment.  Said another way, an examination of the *Yearous* factors to the facts at hand adds little or no guidance to the question the Court must address, i.e., based on the totality of the circumstances, were the working conditions so intolerable that a reasonable person in the Plaintiffs' position would feel forced to resign.  The answer is a resounding "yes."

Unfortunately, Defendants in this case in October, 2005, only ratcheted up the hostile work environment that Plaintiffs faced at WMC, rather than attempting to rectify problems that eventually lead to Plaintiffs' constructive discharge.  The *Yearous* panel found that the nurses at Niobrara County Memorial Hospital could disagree with their supervisor, and refuse to do things which they believed were unethical or would harm patient safety, without repercussion. *Id.* at 1357.  However, the CWN physicians and staff faced swift and severe repercussions for their attempts to improve the working environment and patient safety while at WMC including the withdrawal of critical resources in the form of the CWN OR team, the disruption of surgeries by Defendant O'Connor, false theft allegations, the illegal locker searches, and the jeopardizing of patient safety, with the resulting death of a patient on November 2, 2005.  Here, it is clear that as of November, 2005, Plaintiffs had a reasonable fear that if they continued to perform surgeries at WMC, Defendants would take actions that would negatively impact their medical licenses and also their freedom.  *See* **Appendix 27**, Narotzky 9/30/08 Deposition, pp. 88-89; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.; **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 9**, Affidavit of Robert Schlidt, M.D.

Given the insurmountable factual differences between *Yearous* and this lawsuit, the factors which may have helped the Tenth Circuit decide whether the nurses resignations in *Yearous* were voluntary are not helpful or instructive to determining whether Plaintiffs, at the end of October and early November 2005, were constructively discharged from their medical

staff privileges at WMC.  A reviewing court determines whether Plaintiffs' resignations were voluntary under the totality of the circumstances.  *Potts*, 551 F.3d at 1194.  Work conditions in October and early November of 2005 were rapidly deteriorating at WMC for Plaintiffs. Effectively, all choices or alternatives that Plaintiffs may have had were eliminated by the outrageous conduct of Defendants.  Plaintiffs' resignations were not voluntary because they reasonably feared that if they continued working at WMC any longer, Defendants' actions would permanently impair Plaintiffs' ability to practice medicine.  Defendants' actions left Plaintiffs with no reasonable choice but to resign their medical staff privileges at WMC.  *Potts*, 551 F.3d at 1194.  Under a totality of the circumstances, given the outrageous and unconstitutional conduct of WMC, Plaintiffs' resignations on November 17, 2005 were not voluntary, but were the only reasonable response to Defendants' intolerably hostile work environment at WMC at the end of October 2005 and the beginning of November 2005.

Defendants WMC and Diamond make the argument that "voluntariness is considered at the time of the resignation".  *See* Defendant Wyoming Medical Center and Vickie Diamond's Memorandum in Support of Their Motion for Summary Judgment, p. 31.  Defendants argue that Plaintiffs had decided to resign their privileges at WMC prior to the day they actually resigned and therefore, the sham peer review proceedings, the towel incident, and the theft allegations were "too remote in time to constitute the basis for a constructive discharge claim."  This argument is factually inaccurate and legally unsupported.  First, contrary to Defendants factual allegations to the contrary, Plaintiffs did not apply for staff privileges at Cheyenne Regional Medical Center until November 7, 2005, well after the towel incident, theft allegations, and illegal locker search.  *See* **Appendix 2**, Affidavit of Teena Gering.  Therefore these incidents indisputably contributed to Plaintiffs' constructive discharge.  Also, and as related further herein, Plaintiffs had certainly not made a decision to build a specialty hospital by June 2, 2005.  *See* **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.; **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 9**, Affidavit of Robert Schlidt., M.D.; **Appendix 7**, Affidavit of Mark Orgel and argument on pages 28-32, *supra*.

Finally, Defendants assert that Plaintiffs decided to leave long after the conclusion of the peer review.  While the peer review process that surrounded the March 23, 2004 surgeries

conducted by Dr. Kopitnik concluded as of April, 2005, the animosity and hostile work environment that the biased and sham peer reviews created against Plaintiffs only intensified after the conclusion of the peer review.  *See* **Appendix 44**, Deposition Exhibit 23.  Further, Dr. Kopitnik was the subject of a secret peer review conducted by Dr. Steve Orcutt into the "towel incident" of October 27, 2005.  *See* **Confidential Appendix 16**, O'Connor Deposition Exhibit 20; **Confidential Appendix 32**, WMC MSS 319; **Confidential Appendix 33**, WMC MSS 321; **Appendix 82**, Deposition Exhibit 392.  Despite these documents which show that a second peer review was proceeding, Dr. Orcutt denied there was any new peer review with regard to Dr. Kopitnik.  *See* **Appendix 30**, Orcutt Deposition, pp. 11-15.  Under the totality of the circumstances, the continuing animosity and hostility directed towards Plaintiffs by the peer review concerning the March 23, 2004 surgeries, and the freshly convened secret peer review of the "towel incident" clearly illustrate that peer review was a contributing in the constructive discharge of Plaintiffs on November 17, 2005.  Having already been subjected to a sham and biased peer review for over 18 months,[16] any objective person would believe that a second peer review would be equally biased and unfair.

Defendant's "remoteness" argument  is also legally unsupported by the one case that Defendants cite to for their assertion that certain events are too remote to contribute to a constructive discharge.  *See* Brief in Support of  Wyoming Medical Center and Vicki Diamond's Motion for Summary Judgment, p. 31.  The *Yearous* Court found that the nurses did not give the Niobrara County Hospital a reasonable amount of time to correct the hostile work environment.  *Yearous,* 128 F.3d at 1357 (*citing Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996) ("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.")).  In *Yearous*, the nurses at Niobrara County Memorial Hospital resigned their privileges less than a month after filing their first complaint.  In our case, it is undisputed that Plaintiffs had given Defendants over 18 months to correct the hostile work environment that began with the peer review of Dr. Kopitnik's surgeries on March 23, 2004. Instead of embracing the opportunity to correct the hostile work environment

---

[16] *See* **Appendix 5**, Affidavit of Howard L. Lang, M.D.

faced by Plaintiffs in this lengthy timeframe, Defendants escalated their attack on Plaintiffs as time wore on.

Given the hostile work environment at WMC through the summer and early fall of 2005, Plaintiffs made plans and preparations for their professional careers outside of WMC. However, it always remained Plaintiffs desire that if the Defendants would reconsider their withdrawal of the critical OR team that Plaintiffs could remain at WMC. *See* **Appendix 27**, Narotzky 9/30/08 Deposition, pp. 71-77; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D. **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 11**, Affidavit of Debra Steele, M.D. However, instead of reaching out to Plaintiffs, Defendants escalated the hostile work environment that Plaintiffs were subjected to at WMC. This hostile work environment finally became intolerable at the end of October and beginning of November 2005 when Defendants' outrageous conduct violated the constitutional rights of the Plaintiffs and contributed to the death of a patient. *See* **Appendix 110**, Plaintiffs' Designation of Experts, pp. 2-14. *See also*, **Appendix 27**, Narotzky 9/30/08 Deposition, pp. 88-94. At that point, Plaintiffs only reasonable option was to submit their resignations before they were stripped of their medical licenses, landed in jail, or another patient was negatively affected.

Summary judgment is only appropriate when there is no issue of material fact in dispute and when the movant is entitled to judgment as a matter of law. *Potts*, 551 F.3d at 1192. The existence of a constructive discharge is a factual determination. *Strickland*, 555 F.3d at 1229. Here, there is an abundance of evidence and testimony to prove that Plaintiffs were constructively discharged on November 17, 2005 from their staff privileges at WMC by the intolerable working conditions foist upon them by Defendants. The Court must deny Defendants motions for summary judgment.

## SHAM AND BIASED PEER REVIEW

WMC has adopted By-Laws which govern the operation of WMC. These By-Laws include the Medical Staff By-Laws, the Medical Staff Rules and Regulations, the Quality Management Plan, the Peer Review Plan, the Utilization Review Plan, the Rehabilitation Review Plan, and the WMC, Inc., By-Laws. *See* **Appendix 52**, Deposition Exhibit 45.

The applicable WMC By-Laws provide that the Medical Staff of WMC are supervised by the Executive Committee of the Medical Staff ("Executive Committee").  The Executive Committee is the governing body of the Medical Staff as prescribed in the WMC By-Laws.  *Id.,* § 1.6 of the WMC By-Laws.

Section 9.4-5(b) of the Medical Staff By-Laws provides that the duties of the Executive Committee shall be, among other things, to receive and act upon Committee reports and to make recommendations concerning Committee reports to the Chief Executive Officer and the Board of Directors and to make recommendations to the Board of Directors for corrective action, i.e. disciplinary action, against the medical staff.  *Id.,* § 9.4-5(b)(3)(9), and Chapter 11 of the WMC By-Laws.[17]

Chapter 10 of the Medical Staff By-Laws provides for additional committees of the medical staff including the Peer Review Committee at Section 10.6.  *Id.,* § 10.6, WMC By-Laws. Pursuant to Section 10.6-2 of the Medical Staff By-Laws, the primary duty of the Peer Review Committee is to monitor the current clinical competence of department members.  *Id.,* § 10.6-2 of the WMC By-Laws.  Chapter 10 of the Medical Staff By-Laws provides no authority to the Peer Review Committee to impose punishment or sanctions and all such power is possessed by the Executive Staff and the WMC Board of Directors.  *Id.,* § Chapter 10 of the WMC By-Laws.

Section 11.1 of the Medical Staff By-Laws provides that the Executive Committee may take "corrective action" against a medical staff member only if the Executive Committee takes the action in the reasonable belief that the action is in furtherance of quality health care; after a reasonable effort to obtain the facts of the matter; after adequate notice and hearing procedures as described in these By-Laws are afforded to the member or after such other procedures as are fair to the member under the circumstances; in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain the facts and after complying with the foregoing requirements of Section 11.1.  *See* **Appendix 52**, Deposition Exhibit 45, §

---

[17] The term "corrective action" is not defined in the WMC Medical Staff Bylaws.  A "corrective action" by ordinary usage would be the taking of some step or steps to fix some type of problem.  See Merriam-Webster On-Line Dictionary (http://www.merriam-webster.com/dictionary), which defines "corrective" as "intended to correct" as in "corrective punishment," and "action" as "the bringing about of an alteration by force or through a natural agency." *Id.*

11.1 of the WMC By-Laws.  The term "corrective action" is not defined anywhere in the WMC Medical Staff By-Laws.  Dr. Scaling, the chairman of the Peer Review Committee, admitted that a "corrective action" is some action taken to fix a problem.  *See* **Appendix 34**, Scaling 9/23/08 Deposition, p. 38.  *See also* **Appendix 14**, Barrasso 8/25/08 Deposition; pp. 55-56, and Footnote 17, *supra*.

Pursuant to Section 11.1-2 of the Medical Staff By-Laws, a request for an investigation of a medical staff member must be in writing and be submitted to the Executive Committee and supported by reference to the specific activities or conduct alleged.  *See* **Appendix 52,** Deposition Exhibit 45**, §** 11.1-2 of the WMC By-Laws.  Section 11.1-3 of the Medical Staff By-Laws provides that if the Executive Committee concludes an investigation is warranted, the Executive Committee shall direct an investigation to be undertaken.  *Id.,* § 11.1-3 of the WMC By-Laws.

Section 11.1-4 of the Medical Staff By-Laws entitled "Executive Committee Action" provides that as soon as practicable after the conclusion of the investigation, the Executive Committee shall take action which may include a recommendation for various disciplinary actions.  *Id,* §11.1-4 of the WMC By-Laws.

Section 11.1-5 of the Medical Staff By-Laws entitled "Subsequent Action" provides in Section [b] that the recommendation of the Executive Committee shall be forwarded for review by the Board of Directors for final action unless the member requests a hearing in which case the final decision shall be determined as set forth in Chapter 12.  Section 11.1-5 further provides the Board's approval of the Executive Committee recommendation will not be unreasonably withheld.

Chapter 12 of the Medical Staff By-Laws entitled "Hearings and Appellate Reviews" provides that due process hearings must be conducted for some of the more severe sanctions that could be imposed by the Executive Committee and the WMC Board of Directors including the withdrawal of privileges.

Section 12.2 of the Medical Staff By-Laws provides that a formal hearing must be held for any action which adversely affects a medical staff member as directed by Section 12.3-5 of the By-Laws.  The By-Laws, by reference to Federal Law, define "adversely affecting" as

"reducing, restricting, suspending, revoking, denying, or failing to renew clinical privileges or membership in any healthcare facility." *Id.* § 12.2-2[m] of the WMC By-Laws and 42 U.S.C. Section 11151 (1).

Section 12.3-1 of the Medical Staff By-Laws provides that WMC shall give a member of the medical staff prompt written notice that WMC is considering taking an adverse action against the medical staff member. *See* **Appendix 52,** Deposition Exhibit 45, § 12.3-11 of the WMC By-Laws.

Section 13.2 of the Medical Staff By-Laws provides that dissemination or disclosure of any facts, circumstances, or other matters involved with Peer Review shall not occur and such facts, circumstances, and other matters shall remain confidential and may only be released with the express approval of the Executive Committee or its designee. *Id.,* § 13.2 of the WMC Medical Staff By-Laws.

Section 13.2-2 of the Medical Staff By-Laws provides that any breach of confidentiality of the discussion or deliberation of medical staff, departments, divisions, or committee will be deemed disruptive to the operations of the hospital and the medical staff in that such a violation may result in corrective action as deemed appropriate by the Executive Committee. *Id.,* § 11-1.5 of WMC By-Laws.

On March 23, 2004, Dr. Kopitnik performed a craniotomy for evacuation of a chronic subdural hematoma on a patient at WMC. Dr. Kopitnik was assisted by a physician assistant, Rob Griffin. There is a material dispute regarding how much of the craniotomy procedure was performed by Dr. Kopitnik and what portions of the procedure were done by the physician assistant. Dr. Kopitnik has testified that with regard to the craniotomy case, he excised the scalp, drilled a burr hole in the skull which tore the dura.[18] The "chronic subdural hematoma"[19] drained from the burr hole. Dr. Kopitnik irrigated the opening in the patient's skull to insure there was no active bleeding and electro-cauterized a small bridge vein. At approximately this point in the craniotomy case, Dr. Kopitnik was notified that the cervical patient had been

---

[18] The "dura" is a thin covering layer over the brain.
[19] A "chronic subdural hematoma" is by definition an old collection of blood on the brain. It is liquefied and frequently is the consistency and color of used motor oil. When the dura is punctured, this liquid spontaneously drains out.

anesthetized in the next room without his permission or authority.  Faced with leaving the cervical patient asleep for an extended period of time (or removing the cervical patient from the operating room and waking the patient up), Dr. Kopitnik instructed the physician assistant how to close the craniotomy case.  This involved the removal of a small piece of skull bone, the stitching of the dura, and the replacement of the bone.  Dr. Kopitnik then left, completed the cervical case, and then returned while the physician assistant was finishing the closure of the craniotomy case.  Both patients had very good results with their surgeries.  *See* **Appendix 24**, Kopitnik 12/22/08 Deposition, pp. 466-474.

Ultimately, the physician assistant, Rob Griffin, left the employ of CWN when he and Dr. Sramek were hired as full-time employees of WMC.  Griffin, after becoming a full-time employee of WMC, claimed that Dr. Kopitnik had no involvement in the craniotomy case and never touched an instrument.  Griffin's late and self-serving claim that Dr. Kopitnik did nothing in the craniotomy case is absolutely inconsistent with the statement of the other physician in the room, Dr. Warren Birch, who reported that nothing unusual occurred during the course of the craniotomy.  *See* **Appendix 104**, WMC 053.

Shortly after March 23, 2004, Defendant Pam Fulks and Dick Williams, WMC's attorney, met with Dr. Mary MacGuire, the Department Chair of the WMC Surgery Division and a member of the WMC Executive Committee and Peer Review Committee at all pertinent times herein, and directed Dr. Mary MacGuire to investigate the circumstances of the surgeries performed by Dr. Kopitnik on March 23, 2004.  *See* **Appendix 20,** Fulks 9/15/08 Deposition, p. 26-29.

On March 29, 2004, Dr. Kopitnik and Rob Griffin received a letter from Dr. Mary MacGuire informing them of "some concern regarding the degree of supervision" during the operations on March 23, 2004.  *See* **Confidential Appendix 23***,* WMC 033, **Confidential Appendix 24**, WMC 034.

On March 31, 2004, Dr. Kopitnik wrote a response letter to Dr. Mary MacGuire with details of the situation and informing Dr. Mary MacGuire that, "I was present and scrubbed and personally performed what I deemed the significant portion of the operative procedure."  *See* **Appendix 83***,* Deposition Exhibit 398.

On April 1, 2004, Rob Griffin wrote a letter to Defendant Pam Fulks complaining that Rochelle Satterthwaite had made statements to the effect that the surgeries on March 23, 2004, may constitute "Medicare fraud." *See* **Appendix 102**, WMC 037.  Rob Griffin did not report that he had performed the entire procedure.

On April 12, 2004, while on a WMC flight to Rock Springs, Dr. Anne MacGuire (Dr. Mary MacGuire's sister and a member of the Executive Committee and a member of the Peer Review Committee) told Dr. Mark Dowell and his nurse, Denise Siems, that Dr. Kopitnik committed Medicare fraud and that Dr. Anne MacGuire was going to "nail him." *See* **Appendix 1,** Affidavit of Mark Dowell.  *See also* **Appendix 10,** Affidavit of Denise Siems.

On April 12-14, 2004, Dr. Mary MacGuire made several telephone calls to the Wyoming Board of Medicine and its members regarding Dr. Mary MacGuire's concerns regarding Dr. Kopitnik and Rob Griffin.  The Board of Medicine informed her that they had no issues nor were the surgeries in violation of the Wyoming Medical Practice Act.  *See* **Appendix 25,** Mary MacGuire 5/3/07, pp. 33-34**.** *See also* **Appendix 84,** Deposition Exhibit 402.

On May 25, 2004, Dr. Mary MacGuire, while holding a Peer Review Committee meeting with regard to Dr. Kopitnik, failed to share with other members of the Peer Review Committee any submitted information from Dr. Kopitnik, Rob Griffin and/or CWN.  Dr. Mary MacGuire recommended to the Peer Review Committee that they assess two Level III violations.  A Level III violation per WMC By-Laws indicates a "major deficiency in care has occurred." *See* **Appendix 86,** Deposition Exhibit 557.  *See also* **Appendix 25,** Mary MacGuire 5/13/07 Deposition, p. 12; 36, 38, 48, 58-59; **Appendix 69,** Deposition Exhibit 212.

On May 25, 2004, when Dr. Mary MacGuire presented information to the WMC Peer Review Committee, only four out of the nine doctors, Drs. Scaling, Anne MacGuire, Mary MacGuire, and Todd Witzeling, on the Peer Review Committee were at the meeting.  Both Dr. Anne MacGuire and Dr. Mary MacGuire were biased and prejudiced against Dr. Kopitnik and should have recused themselves from consideration of the matter.  The Peer Review Committee made a determination of two Level III corrective actions against Dr. Kopitnik.  *See* **Confidential Appendix 12,** Deposition Exhibit 388 at Kopitnik-WMC 005-006.

The WMC Peer Review Committee met with regard to Dr. Kopitnik and the March 23, 2004, surgeries on May 25, 2004, June 22, 2004, August 24, 2004, January 4, 2005, and March 22, 2005. Because WMC failed to follow any of the procedures outlined in the Medical Staff By-Laws concerning taking corrective action against Dr. Kopitnik, all of these proceedings and findings against Dr. Kopitnik were made in violation of the WMC Medical Staff By-Laws, and Dr. Kopitnik's 14th Amendment due process and equal protections rights under the U.S. Constitution.[20] The WMC Medical Staff By-Laws violated are specifically set forth in Footnote 20  Dr. Kopitnik, in accepting privileges at WMC, relied on the language of the Medical Staff By-Laws and specifically believed that these by-laws would be followed by WMC. In fact, the language of the Medical Staff By-Laws makes it abundantly clear that the Medical Staff By-Laws are a contract between the medical staff members and the hospital. *See* **Appendix 52**, Deposition Exhibit 45, § 14.5 ("The bylaws, when adopted and approved shall be equally binding on the Board of Directors and the medical staff.")  Dr. Howard Lang, an expert on medical staff by-laws will testify that Dr. Kopitnik was subject to a sham and biased peer review in violation of WMC By-Laws. *See* **Appendix 5**, Affidavit of Howard L. Lang, M.D.

---

[20]   Section § 9.4-5(b):  When the Executive Committee did discuss the matter, Mary MacGuire and Anne MacGuire did not absen*t themselves from the discussion in violation of the conflict of interest provision in this section. See* **Confidential Appendix 22,** WMC 027-029.

Section § 10.6 of the By-Laws provides no authority for the Peer Review Committee to impose "corrective action." All authority to do so is vested in the WMC Board of Directors with the advice of the Executive Committee.

Section § 11.1:  This section limits power of Executive Committee to take action only after guarantee of due process to medical staff member.  (Request for investigation and initial screening to determine if any corrective action should be considered.)

Section § 11.1-2:  Pam Fulks failed to submit the complaint by Donna Marcotte to the Executive Committee. Pam Fulks and Dick Williams forwarded directly to Mary MacGuire with no input from Executive Committee.

Section §11.13:  Executive Committee made no finding that an investigation was warranted and did not direct an investigation to be made.

Section § 11.1-4:  Executive Committee never "took action" at the conclusion of the Peer Review investigation.

Section § 11.1-5:  The Executive Committee never forwarded their action for review by the Board of Directors.

On June 8, 2004, Dr. Scaling, the Chairman of the Peer Review Committee, informed Dr. Kopitnik by letter that the Peer Review Committee had found that major deficiencies in care had occurred (Level III) on the two surgeries of March 23, 2004. *See* **Appendix 93,** CWN 027.

On June 21, 2004, Dr. Kopitnik wrote a letter in response to Dr. Scaling requesting the Level III determinations be removed from his record until a comprehensive Peer Review was conducted. Dr. Kopitnik noted that no one from Peer Review interviewed Dr. Kopitnik, Rob Griffin, or the anesthesiologists that were in the operating room on March 23, 2004. *See* **Confidential Appendix 25,** WMC 046-047. *See also*, **Appendix 23**, Kopitnik 9/26/08 Deposition, pp. 154-155.

On June 22, 2004, the Peer Review Committee held a meeting attended by Drs. Scaling, Cunningham, Granum, Iverson, Anne MacGuire, Mary MacGuire, Robitaille, Stinson, and Witzeling. Dr. Scaling, for the first time, supplied the information provided by Griffin, Kopitnik, and CWN to the Peer Review Committee. The Peer Review Committee made no further decision during this meeting. *See* **Confidential Appendix 12,** Deposition Exhibit 388 at Kopitnik WMC-Subpoena 0005-0007.

On July 27, 2004, Dr. Narotzky, Dr. Kopitnik Dr. Sramek, and Bill Garden met with Dr. Scaling, Dick Williams, and other WMC administrators to review the Peer Review investigation. During this meeting, Dr. Scaling stated that the Peer Review Committee did not have all of the information when the "chart" was initially reviewed and that Dr. Scaling was going to recommend that the Peer Review Committee make a Level "0" finding indicating that there was "no deficiency identified" and that "the clinical practice is acceptable." Dr. Scaling also stated that, "Dr. [Mary] MacGuire should not have withheld information from the Peer Review Committee." *See* **Appendix 69,** Deposition Exhibit 212. *See also*, **Confidential Appendix 31,** WMC MS 00026-27; **Appendix 22**, Garden 9/19/08 Deposition, pp. 233-234; **Appendix 23**, Kopitnik 9/26/08 Deposition, pp. 127-128; 175-176; **Appendix 34,** Scaling Deposition 9/23/08, p. 70..

On August 24, 2004, the Peer Review Committee held a meeting with Drs. Scaling, Granum, Anne MacGuire, Mary MacGuire, Robitaille, and Stinson present. The Peer Review Committee made the following findings:

(a)     The physician assistant was not practicing within the scope of the privileges granted by the hospital in that he was not directly supervised.  Direct supervision per the WMC is defined "as over the shoulder supervision."

(b)     The physician assistant was credentialed to operate with Dr. Sramek and not Dr. Kopitnik.

(c)     The two Level III designations should be changed to one Level II because "the 'direct supervision' portion of the physician assistant privileges were not followed."

*See* **Confidential Appendix 12,** Deposition Exhibit 388 at Kopitnik-WMC Subpoena 0010-0011.

Elise Brennan, an attorney representing the hospital and a WMC-designated expert witness, participated by phone in the peer review meeting at the demand of Mary MacGuire. Ms. Brennan apparently told the Peer Review Committee that Dr. Kopitnik had to be subject to corrective action rather than Dr. Sramek or the physician's assistant.  *See* **Appendix 69**, Deposition Exhibit 212 at CWN 4569.  Brennan's participation and apparent direction as to who should be punished by the Peer Review Committee goes well beyond the role of legal advisor and violates the WMC Medical Staff Bylaws.

The fact that the peer review of Dr. Kopitnik was based on spite, bias, and was fatally flawed is graphically illustrated by the August 8, 2004, e-mail from Mary MacGuire (Head of the Department of Surgery at WMC and Dr. Kopitnik's chief prosecutor) to John Barrasso (WMC Chief of the Medical Staff.  *See* **Appendix 53,** Deposition Exhibit 47**.**  In this e-mail, Dr. Mary MacGuire informed Chief of Staff Barrasso that:

> . . . Sam Scaling cancelled Peer Review to have a private meeting with Central Wyoming Neurosurgery and their business manager about the case in which Robbie Griffin did a craniotomy while Dr. Kopitnik did a neck fusion in the next room.
>
> * * *
>
> Sam has run Peer Review for himself and his cronies for long enough.  He has used his chairmanship to prevent the review of a case that fell out for review and for which he and Lou Roussalis are now being sued.  He got the outside reviewer changed to someone he wanted, got the questions for the reviewer framed by his friend, Dick Williams, and kept the unflattering results of the review out of the sight of the committee.  This would never have happened if one of his competitors

was accused of the things of which he and Lou were publicly accused….i.e. having someone do the surgery other than the person the patient and family expected, covering up bad results and having the surgery done by someone who was not qualified to do it.

* * *

Enough is enough.  Sam has no business wiping away the peer review in a case in which the surgeon had a P.A. for whom he is not the supervisor do an independent surgery when the P.A.'s privileges are for working in the OR. under the immediate supervision of his physician, the patient and family were not told, and the patient had a longer operation than she would have had (in my opinion) than she would have if the man whose name is on the consent had done the surgery.  There is still the unresolved question of whether or not Medicare would consider this fraud.  It is also extremely inappropriate for the peer review committee to tolerate threats to one of its members (me) and to OR. staff who wrote this up in an effort to see that patients get good care.

It is my intention to ask Sam for his resignation for unethical behavior.  I would prefer to do this in a private meeting with you and Sam, but if he refuses to resign, or that meeting does not take place, I will do so in the Peer review meeting and will detail all the ways Sam has used Peer review to injure his competitors and to help his cronies.  JACHO [sic] will have no patients with an institution that has two peer review systems, and so blatantly operates to cover things up.  This will be a huge problem with our recertification.  If necessary, I will report this to JACHO [sic] and to Medicare, because the craniotomy patient was 80 years old.  I am sure her physician son would not be happy to hear how his mother was treated.

I think it is imperative to stop this and to apply the same rules to all, in an impartial fashion.  If we do not do so and this goes on, it will reach the press, and our chances for peer review will go down the drain. . . .

In one e-mail in the middle of her crusade to "nail" Dr. Kopitnik, Dr. Mary MacGuire accuses Dr. Scaling, the Chairman of the Peer Review Committee, and Dick Williams, WMC's lawyer, of conspiring to use the Peer Review Committee to cover up Dr. Scaling's and his partner's medical incompetence and as a tool to protect Scaling's "cronies."  Dr. MacGuire also, unintentionally perhaps, shows the incredible disdain, bias, and prejudice she possesses for Dr. Kopitnik.  Dr. Scaling explicitly testified that Dr. Mary MacGuire's scandalous accusations against Dr. Scaling are outright lies.  *See* **Appendix 34,** Scaling Deposition at pp. 19-31**.**

Not surprisingly, no one from WMC, including Mike Reid, Pam Fulks, or even Drs. Scaling or Barrasso, has any memory of having seen Dr. Mary MacGuire's August 8, 2004, confession. *Id., at* pp. 18-19.  *See also* **Appendix 14,** Barrasso Deposition, p. 30; **Appendix 20**, Fulks 9/15/08 Deposition, pp. 55-56; **Appendix 31,** Reid 9/4/08 Deposition, p. 92.  To admit that they saw the e-mail in and around August 8, 2004, when the e-mail was sent to Dr. Barrasso would be to admit that WMC did not care how unfair the Kopitnik peer review was; that WMC did not care how biased and unethical the investigation was; that the peer review was nothing more than another tool used to try to drive Dr. Kopitnik from WMC.

Section 11.1 of the Medical Staff Bylaws provides:

> For the purpose of these Bylaws, any corrective action must be taken (1) in the reasonable belief that the action is in the furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures as described in these Bylaws are afforded to the member or after such other procedures as are fair to the member under the circumstances; (4) in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain the facts and (5) after complying with the foregoing requirements of this paragraph.

Allowing Dr. Mary MacGuire to continue to direct, and be involved in the Kopitnik peer review and the ultimate imposition of a "corrective action" against Dr. Kopitnik was in direct violation of § 11.1.  Dr. Barrasso, who allowed Dr. Mary MacGuire to continue to be involved in the peer review while apparently possessing direct knowledge that Mary MacGuire had made false and scandalous allegations against Dr. Scaling and was horribly biased against Dr. Kopitnik, violates many duties and obligations Dr. Barrasso had as Chief of Staff.  *See* **Appendix 52**, Deposition Exhibit 45, §9.1-3.[21]

On October 6, 2004, Dr. Kopitnik received a modified Level II determination letter on the craniotomy case.  The cervical case was never mentioned in the letter.  *See* **Appendix 85**, Deposition Exhibit 404.

---

[21] Dr. Barrasso certainly failed to "enforc[e] Medical Staff Bylaw, Rules and Regulations, implementing sanctions where indicated, and promoting compliance with procedural safeguards where corrective action has been corrected or initiated."

In October 2004, a member of the WMC medical staff and/or employee of WMC wrote an anonymous letter to the Office of Inspector General ("OIG") and the editor of the *Casper Star-Tribune* which defamed Dr. Kopitnik.  *See* **Appendix 55***,* Deposition Exhibit 49.  This letter was distributed via deposit into WMC medical staff mail boxes.  *See* **Appendix 20***,* Fulks 9/15/08 Deposition at pp. 57-60.

On or about November 2004, a member of the WMC medical staff and/or employee of WMC wrote an anonymous note defaming Dr. Kopitnik providing:

> Good luck bullying your way out of this one, you prick.  What goes around, comes around.  It will be splendid news to read about you in the newspaper, and oh my, with the OIG.

*See* **Appendix 54**, Deposition Exhibit 48.  This letter was distributed via WMC mail boxes.  *See* **Appendix 20***,* Fulks 9/15/08 Deposition, p. 58.

The Defendants, including Pam Fulks, Mike Reid, and the WMC Board of Directors, were aware of the circulation of these defamatory statements, as noted above, which were disseminated by one or more employees of WMC or member of the medical staff and contained confidential Peer Review information.  *Id*. at 58.

The Defendants took no action to investigate who was leaking Peer Review information, in violation of the WMC By-Laws, to the general public and the news media in Casper, Wyoming.  *Id, at* 59.  Rather than interview employees or review videotapes of who may have placed the defamatory letters in WMC mail boxes or examine copy records, Pam Fulks merely asked Mary MacGuire if she or her sister, Anne MacGuire, were responsible.  Mary MacGuire, of course, denied the allegation.

On November 17, 2004, Dr. Scaling, by letter, notified Dr. Kopitnik that the Peer Review Committee had entered a modified Level II determination regarding the craniotomy case.  The cervical case was "dropped without any further review."  The Peer Review Committee found that neither patient had experienced a poor outcome or patient problems.  *See* **Confidential Appendix 12**, Deposition Exhibit 388 at Kopitnik-WMC Subpoena 0014.

On December 7, 2004, Dr. Warren Birch, the anesthesiologist on the craniotomy surgery wrote a letter to Chief of Staff John Barrasso stating that he "was not concerned with Dr.

Kopitnik leaving the room prior to the conclusion of the operation since surgeons frequently allow assistants to close without their actual physical presence but remain available if needed." *See* **Appendix 104**, WMC 053.

On March 2, 2005, Defendant Mike Reid, Chairman of the Board of WMC, sent an e-mail to Defendant Pam Fulks as follows:

> Pam, this is exactly what I mean about the doc's being behind us.  At this point, I refuse to take the neuro-guys on because this is what will happen to us, our fronts and backs will both be bloodied.  Please contact Sam [Scaling] again today and have him send you a letter saying he and Peer Review have agreed to a third party.  Take another look at this issue and we'll agree to whatever comes from it.  Also, after you receive that, send a letter to neuro-docs and have them agree in writing, to whatever action comes from this outside party.  I want our butts covered on this.  I want everyone to know this was Peer Review docs call and not ours.  I can't believe Sam has hung us out to dry on this knowing what we have went through for them.  It's 7:10 a.m. and I'm already sick and tired.  Mike.

*See* **Appendix 62,** Deposition Exhibit 121.

In March 2005, Defendant Pam Fulks prepared a memo for the WMC Board of Directors entitled "Neurosurgery Options."  Defendant Fulks outlined three options regarding CWN:

(a)    "Tell CWN the Peer Review Decision is beyond the control of the administration and Board of Directors and any negotiation must be between physicians."

(b)    "Tell CWN the Peer Review decision is final and beyond the control of administration and the Board of Directors", or

(c)    "Recruit a new neurosurgery group," and begin a political campaign to discredit CWN and try to paint WMC in a positive light.

*See* **Appendix 46**, Deposition Exhibit 28.

In April 2005, and unbeknownst to CWN and Drs. Narotzky, Kopitnik, and Steele, WMC began recruiting other neurosurgeons to perform surgery at WMC.  *See* **Appendix 108**, Kopitnik-WMC Subpoena 1062.  In fact, Fulks began trying to recruit Dr. Sramek away from CWN as early as December, 2004.  *See* **Appendix 56,** Deposition Exhibit 59.

On April 27, 2005, after inquiry was made by CWN regarding advertisements in Rapid City to recruit neurosurgeons, Defendant Pam Fulks lied to Dr. Narotzky by stating that WMC had no role in the job postings.  *See* **Appendix 108**, Kopitnik-WMC Subpoena 1062.

After Dr. Narotzky presented the job posting to Defendant Pam Fulks by e-mail on May 1, 2005, on May 6, 2007, Defendant Pam Fulks then admitted that WMC had contacted a recruiter who posted the job on an internet website.  *See* **Appendix 66**, Deposition Exhibit 157.

Other physicians with privileges at WMC have conducted operations at WMC with the assistance of non-credentialed operating room personnel and/or with operating personnel, including physician assistants, who were not credentialed or authorized to assist that particular physician.  None of these other physicians were subjected to peer review investigations or punishment by WMC or any WMC authorized committee, including the WMC Peer Review Committee, for those actions.

Dr. Kopitnik was found to have operated with physician assistant Rob Griffin, who was authorized to operate only with Dr. Sramek.  Records produced by WMC show that Griffin also assisted in surgeries performed by Dr. Mary MacGuire, Dr. Lane Smothers, Dr. Eugene Podrazik, Dr. Todd Beckstead, Dr. John Bailey, Dr. Janet MacKenzie, and Dr. Narotzky.  *See* **Confidential Appendix 11**, Deposition Exhibit 384; **Confidential Appendix 26**, WMC 3302-3313.  All of these members of the medical staff, who engaged in the same conduct which resulted in Dr. Kopitnik receiving corrective action, have apparently not been investigated, sanctioned, or been subject to corrective action.  Dr. Steplock, a cardiac surgeon, has testified that he routinely used a nurse (who with further schooling ultimately became a physician assistant) to harvest radial veins from patients when Dr. Steplock was not even present in the operating room.  *See* **Appendix 39,** Steplock Deposition at pp. 14-16.  No corrective action was taken against Dr. Steplock.

It cannot be denied that Dr. Kopitnik was singled out for punishment for actions which other members of the medical staff, including his chief tormentor, Mary MacGuire, had engaged in.

Pursuant to WMC Medical Staff Bylaws, the authority to impose any finding for a Peer Review of a medical staff member is vested with the Executive Committee of the medical staff and the WMC Board of Directors.  The findings of the Peer Review Committee regarding Dr. Kopitnik were never submitted to the Executive Committee for action.  The Executive Committee never submitted the Peer Review findings to the WMC Board of Directors for final

action.  All actions regarding the Peer Review of Dr. Kopitnik regarding the March 23, 2004, surgeries were made in violation of WMC By-Laws and violated Dr. Kopitnik's 14th Amendment right to substantive and procedural due process and equal protection of law.

On April 6, 2005, Defendants Pam Fulks and Mike Reid wrote a letter to CWN and stated, "This is the final concluding act of the Peer Review and it provides the Peer Review decision is now final and no longer open for discussion."  Defendants Fulks and Reid had no authority under WMC Medical Staff By-Laws to make this finding or take this action.  *See* **Appendix 45**, Deposition Exhibit 26.

<u>**CANCELLATION OF THE OR TEAM CONTRACT**</u>

On or about July 15, 2004, the WMC entered into an exclusive contract with CWN to have CWN provide a specialized group of nurses, scrub techs and others to assist Drs. Narotzky, Kopitnik and Sramek with regard to the very delicate, difficult, and highly specialized neurosurgical procedures that your Affiant was performing at WMC.  Pam Fulks testified that creation of the OR team contract took courage on her behalf and was a bold and risky move on her part because of opposition from other members of the medical staff.  *See* **Appendix 20**, Fulks 9/15/08 Deposition, p. 43.  This OR team contact worked very well and improved the quality of patient care rendered to patients seeking surgical procedures at WMC.  The OR team also led to increased efficiencies in the operating room including dramatically reduced turn-around times. *Id.* at 237.  Pam Fulks reported on several occasions to the WMC Board of Directors that the operating team was working well and was a benefit to WMC and the patients who sought their medical care at WMC.  *See* **Confidential Appendix 9,** Deposition Exhibit 237 and **Confidential Appendix 10**, Deposition Exhibit 238 at WMC 3908 and WMC 3914.  Shortly after the conclusion of the peer review matter, Pam Fulks, on behalf of WMC, wrote at least two letters indicating that WMC wished to meet with CWN and its physicians to continue the OR team contract past its scheduled expiration date of July 15, 2005.  *See* **Appendix 77,** Deposition Exhibit 240 and **Appendix 78,** Deposition Exhibit 241.

On or about May 26, 2005, Dr. Kopitnik and the then Business Manager of CWN, Bill Garden, met with the editorial board of the *Casper Star-Tribune*.  Based on this meeting with the editorial board, an article appeared in the *Casper Star-Tribune* on May 27, 2005.  Subsequent to

this article appearing in the *Casper Star-Tribune*, Pam Fulks sent an e-mail to CWN which indicated that:

> Bill, After reading the outrageous comments in today's paper and your and Tom's end run tactics-again, I want you to stop plans for a facilitation meeting until I have had a chance to talk to my Board.  I visited at length with Bob this morning and have asked him to intervene and he tells me he will.  I will let you know what our Board is now willing to do and you need to talk to Bob.  I honestly cannot believe that you and Tom pulled this.  This is a new low.  I am extremely disappointed.  Pam.

*See* **Appendix 81,** Deposition Exhibit 316.

On June 3, 2005, Pam Fulks then drafted a letter which she intended to have sent to CWN indicating that the Board of Directors had appointed an *ad hoc* committee to meet with CWN and discuss the **termination** of the OR team contract.  *See* **Appendix 61**, Deposition Exhibit 94 at MR 209.  No factors concerning the performance of the OR team had changed between earlier in the year when WMC indicated its desire to continue the OR team contract and May 27, 2005, when WMC indicated it wished to meet with CWN to terminate the OR team contract other than the CWN meeting with the editorial board and the May 27, 2005, newspaper article.

After May 27, 2005, an *ad hoc* committee which was allegedly appointed by the Board of Directors met with CWN to discuss the OR team contract.  The minutes of the Board of Directors' meetings in 2005 show no appointment of an *ad hoc* committee to meet with CWN to discuss the exclusive OR team contract.  No documents produced to date show that this *ad hoc* committee was actually appointed by, or operated pursuant to, the authority of the WMC Board of Directors.  *See* **Appendix 32**, Reid 10/7/08 Deposition, pp. 252-253.  Instead, minutes of the June 8, 2005, Board of Directors meeting show that Pam Fulks had apparently "developed [a committee] to meet with CWN to hear their concerns."  *See* **Confidential Appendix 3**, Deposition Exhibit 95 at WMC 3968.  In addition, this committee had several individuals who were heavily biased against CWN, including Dr. John Bailey, Pam Fulks, and Vickie Diamond.  Dr. Bailey was a direct competitor of CWN.  Ultimately, after engaging in a charade that the *ad hoc* committee was actually studying whether to continue or terminate the exclusive OR team contract, the committee recommended to the Board of Directors that the OR team contract

should be terminated.  Dr. Bailey was on both the *ad hoc* committee and the WMC Board of Directors which ultimately voted to terminate the OR team contract, effective October 31, 2005. Dr. Bailey's motion to terminate the OR team contract violated the Medical Staff Bylaws[22] and all rules of conflict of interest followed by the WMC Board regarding physician board members voting with regard to other physicians' contracts.

On July 25, 2005, the *ad hoc* committee wrote a letter to CWN indicating that it was terminating the OR team contract for "business reasons."  **Appendix 89**, O'Connor Deposition Exhibit 2.  The termination of the OR team contract was done intentionally by WMC in an effort to force the CWN physicians to resign their privileges at WMC.  This exclusive OR team was part and parcel of the critical and necessary resources needed to perform the highly difficult, delicate, and complicated neurosurgical procedures which CWN physicians were then performing at WMC.  Operating without this dedicated OR team would have subjected patients to undue risk during the course of their surgeries at WMC.  WMC By-Laws Section 6.1 provides "[w]hen privileges are granted it also includes **the right to exercise those privileges including use of appropriate hospital facilities**." (emphasis added)  The removal of the CWN OR team was a dramatic limitation of the CWN surgeons' privileges.  Without this critical and necessary

---

[22] Before WMC could terminate the OR team contract, WMC needed to consult with, and obtain the recommendation of, the WMC Medical Staff.  **Appendix 52**, Deposition Exhibit 45, § 12.6-1 at p. 54 provides, "[i]t is the shared responsibility of the Medical Staff and the Board of Directors to assess whether a particular clinical service may best be provided, from both a patient care and service to the Medical Staff perspective, through an exclusive contract, and if so, to whom such a contract should be granted."

§ 12.6-3 provides:

> It is the shared responsibility of the Medical Staff and the Board of Directors, through the Medical Staff Development Committee, to assess whether a Medical Staff department/service should be formed or eliminated.  Such decisions may affect existing Medical Staff membership and may only be made following a determination by the Medical Staff of appropriateness of department/service elimination or formation.  The Board of Directors shall make its final decision with respect to department/service formation or elimination issues after full consideration of the analysis and recommendations of the Medical Staff. . . .

*See* **Appendix 52**, Deposition Exhibit 45, § 12.6-3 at p. 57-58

The Medical Staff was never consulted whether the OR team contract should be cancelled as evidenced by the November 8, 2005, Medical Staff directive to urge the WMC Board of Directors to continue to mediate with the Plaintiffs with regard to the OR team contract.  *See* **Appendix 107**, WMC 4073.

resource, they could not even use the "hospital facilities," i.e. the operating room.  The CWN OR Team contract was cancelled to retaliate for the interview with the *Casper Star-Tribune* and to try to coerce CWN physicians to resign their privileges at WMC.

One of the reasons used by WMC to justify the termination of the OR team contract centered on Dr. Sramek's resignation from CWN on June 10, 2005.  On June 10, 2005, Dr. Sramek resigned as an employee of CWN and was immediately hired by WMC.  WMC originally refused to produce documents concerning Dr. Sramek's employment.  Pursuant to an Order issued by this Court on February 9, 2009, WMC finally produced financial records with regard to Dr. Sramek's employment by WMC, which commenced in June, 2005.  WMC continues to maintain that all of these records are "confidential."  An analysis of the money lost by WMC with regard to its employment of Dr. Sramek, and a subsequently recruited partner, Dr. Brian Wieder, is contained in **Confidential Appendix 34,** Confidential Exhibit 1.  A copy of Dr. Sramek's contract with WMC is contained in **Confidential Appendix 30**, WMC 5100-5113. **Confidential Appendix 34**, Confidential Exhibit 1, details the net loss experienced by WMC with regard to Dr. Joe Sramek and his subsequently recruited partner and the creation of various business entities including Sage Medical Institute and Wyoming Brain and Spine Associates by WMC.

Apparently, WMC first created a written contract with Sramek in June, 2005.  *See* **Confidential Appendix 30,** WMC 5100-5113.  WMC continues to claim that Sramek's contract with a public hospital is confidential.  This claim precludes discussion of actual terms of the contract in this publicly-filed response.  **Confidential Appendix 35**, Confidential Exhibit 2, details the various expenses paid by WMC pursuant to the contract.  IRS Form 990, which is a publicly-filed document, shows that in calendar year July 1, 2006, through June, 30, 2007, Sramek was paid $1,445,181.  *See* **Appendix 106,** WMC 3824, 3833.  The receipt of over $1,445,181 million while WMC pays all expenses is an incredible deal for Dr. Sramek.  To label this contract as a "sweetheart deal" is a gross understatement.

Because WMC had no substantive or rational basis to cancel the OR team contract, they deliberately and intentionally recruited Dr. Sramek away from CWN in order to create a justification for cancellation of the OR team contract.  This recruitment began as early as

December, 2004.  *See* **Appendix 56**, Deposition Exhibit 59; **Appendix 20**, Fulks 9/15/08 Deposition, p. 135.  Ultimately, WMC tried to justify cancellation of the OR team contract based on the existence of two neurosurgery groups and alleged that they could not afford to provide two OR operating teams to two groups.  Dr. Sramek refused, after his recruitment and the gift of his "sweetheart deal" by WMC, to operate with the CWN OR team.  *See* **Appendix 37**, Sramek Deposition, pp. 107-108.  Dr. Narotzky and Dr. Kopitnik offered to fund the continued use of the CWN OR team entirely out of their own pockets if they would have been allowed to continue to use the team to help them with regard to their neurosurgical practice at WMC.  *See* **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.; **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D. This offer to fund approximately $700,000 of additional support personnel free of charge to WMC was rejected by the WMC administration.[23]

CWN generated over $2.7 million in **net revenue** for WMC during the fiscal year ending June 30, 2004.  *See* **Appendix 57**, Deposition Exhibit 70.  Ed Renemans, WMC's CFO at the time, estimated that CWN profits were 62 percent of the entire profit of WMC in the 2004-2005 time frame.  *See* **Appendix 33**, Renemans Deposition, pp. 77-78; **Appendix 58**, Deposition Exhibit 77.  WMC's vindictive and spiteful decision to cancel the OR team contract, which was part of the hostile and intolerable work environment perpetrated by WMC with regard to the CWN physicians, and the recruitment of Dr. Joe Sramek as a full-time employee with WMC, has resulted in large net losses for WMC since June, 2005, with regard to its neurosurgical line of services as detailed in **Confidential Appendix 34**, Confidential Exhibit 1.  While the cancellation of the OR contract was justified as a "business decision," such decision has cost WMC well over $10 million between 2005 and June 2008 when the lost CWN net revenue is added to the WMC loses sustained with regard to the Drs. Sramek and Weider contracts.

## ECONOMIC CONFLICT OF INTEREST POLICY

During the summer of 2004, WMC began the process that ultimately led to the adoption of an "Economic Conflict of Interest Policy."  The Economic Conflict of Interest Policy was

---

[23] Both Pam Fulks and Vickie Diamond testified they had never heard of or experienced such an offer in their collective 54 years of hospital administration.  See **Appendix 20**, Fulks 9/15/08 Deposition, p. 242 and **Appendix 18**, Diamond 9/3/08 Deposition, pp. 204-205.

ultimately adopted on August 11, 2004, and modified on September 20, 2004.  *See* **Confidential Appendix 1,** Deposition Exhibit 51 and **Confidential Appendix 2,** Deposition Exhibit 53. Fulks and Reid ultimately admitted that the policy was aimed at preventing CWN from building any type of competing facility in Natrona County, Wyoming.  *See* **Appendix 20***,* Fulks 9/15/08 Deposition, pp. 196-199; **Appendix 31***,* Reid 9/4/08 Deposition, pp. 211-212; **Appendix 26***,* McMurry Deposition, pp. 62-72; 75-76.  The Economic Conflict of Interest Policy provided that any member of the medical staff who invested directly or indirectly in a "competing hospital" would automatically be stripped of all privileged at WMC without any due process rights under the Bylaws.  "Competing hospital" was defined as a "hospital licensed in Wyoming or any subsidiary component, division or other part of any such hospital, including any new ambulatory surgical center or any existing surgical center which expands into a short-stay or full-service hospital."  *See* **Confidential Appendix 6**, Deposition Exhibit 134.  At the time of adoption in September 2004, there were a number of competing surgery centers in Casper, including Sterling Surgery Center, Casper Surgical Center, and Wyoming Surgical Center  All of these existing facilities, including Wyoming Surgical Center, were exempted from operation of the policy by the definition of "competing facility."

This Economic Conflict of Interest Policy directly violated the WMC Medical Staff Bylaws at the time of adoption.  Medical Staff Bylaw Section 6.1 explicitly provides that:

> **The termination, granting, continuation or modification of Medical Staff privileges based on economic criteria unrelated to clinical qualifications, professional responsibilities, or quality of care is prohibited**, with the exception of statutory, regulatory, or judicial requirements, or other exception which may be defined in the Medical Staff Bylaws.

(Emphasis added.)  *See* **Appendix 52**, Deposition Exhibit 45, p. 18.

The Economic Conflict of Interest Policy, which would have stripped the Plaintiffs' privileges if they invested in a competing facility, certainly would have resulted in the "termination . . . of Medical Staff privileges based on economic criteria unrelated to clinical qualifications, professional responsibilities, or quality of care. . . ."[24]

---

[24] Elise Brennan, WMC's designated expert on medical staff by-laws and WMC's medical staff attorney for the last ten years has admitted this fact.  *See* **Appendix 15**, Brennan Deposition, pp. 141-148

To further protect the favored physicians that serve on the WMC Board of Directors and their investments in competing facilities, the definition of "competing hospital" in the Economic Conflict of Interest Policy was amended at the September 20, 2004, WMC Board of Directors meeting.  Dr. Jim Anderson, who competes with WMC through his ownership in Casper Surgical Center; Dr. John Barrasso, who competed with WMC through his ownership of Casper Orthopedic Associates and Wyoming Surgical Center; and Dr. Walker, who competed with WMC through his ownership in Outpatient Radiology,[25] (*See* **Appendix 59**, Deposition Exhibit 89 and **Appendix 33**, Renemans Deposition, pp. 107-121) had all previously declared a conflict of interest with regard to the policy at the advice of hospital counsel.  *See* **Confidential Appendix 1**, Deposition Exhibit 51.  The Minutes of the September 20, 2004, meeting reflect the following after the Board had looked at three definitions of "competing hospital.

> After much discussion, Chairman Reid recommended option 1 deleting the wording "into a short stay or otherwise expands its capacity."  Drs. Anderson, Walker, Grinstead, and Barrasso declared a conflict of interest with this issue and brief discussion was held regarding the wording.  The following wording was suggested:

> 6.    Definitions
>    A.    "Competing hospital" means a hospital licensed in Wyoming or any subsidiary, component, division or other part of any such hospital, including any new ambulatory surgical center, or any existing ambulatory surgical center which expands its services into a full service hospital.

> All physician board members left the meeting at this time and

> **On a motion from Chris Muirhead to accept the above definition with the proposed changes with support from Susie McMurry, the Board unanimously voted to approve.**

> [Emphasis in original.]

---

[25] Dr. Walker had already gained significant protection from the policy during the August 11, 2004, Board meeting when new facilities providing "diagnostic services" such as x-rays, CT scans, MRIs, etc., provided by Dr. Walker were exempted from the policy.  *See* **Confidential Appendix 1,** Deposition Exhibit 51 at WMC 3900.

Based on these events, it is patently clear that the WMC Board of Directors allowed Drs. Walker, Barrasso, and Anderson, in total disregard of their declared conflict of interest and prior recusal, to direct the Board to choose the definition of a "competing hospital" that could not affect their own financial interests.  *See* **Appendix 13**, Anderson Deposition, pp. 96-97.  Having protected the favored physician Board members, the WMC Board of Directors deliberately targeted CWN with the policy.

By December 6, 2005, less than 30 days after the CWN physicians had been forced to resign their privileges at WMC , Dr. John Bailey, Dr. Barrasso's partner in Casper Orthopedic Associates, began the process that ultimately led to the rescission of the Economic Conflict of Interest Policy on January 10, 2007.  *See* **Confidential Appendix 28**, WMC 4085-4086 and **Confidential Appendix 29**, WMC 4225-4228.  Having finally driven the Plaintiffs from WMC, there was obviously no need for the policy, which might somehow burden the economic plans of some other member of the medical staff.  The ultimate rescission of the policy, the careful carving out of favored physicians, and the timing of Dr. Bailey's move to rescind the policy,  are damning evidence that the policy was enacted and targeted at CWN as yet another WMC action to drive CWN from WMC.

## LOCKER SEARCH AND THEFT ALLEGATIONS

In addition to the malicious, intentional, and illegal actions of Defendants directed toward the Plaintiffs from March 2004 through the summer of 2005, the actions of Defendants took on a new, sinister, and extremely retaliatory turn at the end of October 2005.  At that time, the situation at WMC for the Plaintiffs deteriorated to such a degree that Plaintiffs genuinely feared that the extremes that WMC would undertake to prevent them from exercising their constitutional protected property interest in their medical staff privileges at WMC would not only continue to negatively impact the level of patient care at WMC, but could to the loss of their licensure as Wyoming physicians.  WMC's action in general, and the actions of Defendant O'Connor in particular, drove home to Plaintiffs that Defendants would not allow them to continue practicing medicine at the hospital in peace and led to such an intolerably hostile work environment that the Plaintiffs were left with no other alternative but to resign their staff privileges at WMC.

Plaintiffs also reasonably feared that the actions of Defendants would continue to negatively impact the health and well-being of their patients, with possibly drastic consequences, such as the death of a patient of Dr. Narotzky's on the early morning hours of November 2, 2005. *See* **Appendix 6**, Affidavit of Robert A. Narotzky, M.D.

At least three incidents gave rise to the horrendously **intolerable working environment** at WMC in October of 2005: 1) The compromise of patient safety and privacy by the actions of Head of Perioperative Services Defendant Mary Jane O'Connor removing towels from the windows of Dr. Kopitnik's and Dr. Steele's operating rooms on October 27; 2) the illegal search of the Drs. Narotzky's and Kopitnik's and CWN staffs' lockers by WMC personnel, including Defendant O'Connor; and 3) the filing of theft charges with the Casper Police Department by WMC against Doctors Narotzky and Kopitnik, as well as CWN staff. The intolerably hostile work environment left Plaintiffs with no option but to resign their staff privileges at the hospital.

## IMPROPER MULTIPLE ENTRIES INTO A STERILE OPERATING ROOM BY MARY JANE O'CONNOR – PATIENT SAFETY

On October 27, 2005, while Drs. Kopitnik and Steele were performing surgeries in two separate operating rooms at WMC, Defendant Mary Jane O'Connor came into both operating rooms, without wearing sterile surgical scrubs on or a mask covering her face, and removed towels covering the windows on the operating room doors. These towels were placed over the windows to provide privacy to the patient on the operating room table. *See* **Confidential Appendix 15**, O'Connor Deposition Exhibit 16. After contacting Defendant Vicki Diamond and receiving reassurance that her marching orders to remove the offending window coverings was still valid, Defendant O'Connor left to check on "her" operating rooms again. Defendant O'Connor returned to find that CWN staff placed towels over the windows again. This so enraged Defendant O'Connor that she burst into Dr. Kopitnik's OR and declared that the operating room was "[her] house and that she wanted [the towels] down" and that no one was going to cover the windows so that she could not view what was occurring in the operating room. *See* **Appendix 29**, O'Connor Deposition, p. 109. Defendant O'Connor then proceeded to the operating room where Dr. Steele was performing a surgery, entered the operating room and removed the towels providing patient privacy on the windows in that operating room. *See* **Confidential Appendix 13**, O'Connor Deposition Exhibit 14; **Confidential Appendix 14**, O'Connor Deposition Exhibit 15; **Confidential Appendix 15**, O'Connor Deposition

Exhibit 16; and **Confidential Appendix 5**, Deposition Exhibit 111.  *See also* **Appendix 29**, O'Connor Deposition, pp. 95-126; **Appendix 18**, Diamond 9/3/08 Deposition, pp. 221-229.

Due to the reckless disregard for patient safety displayed by Defendant O'Connor, Dr. Kopitnik so feared that his patient had been exposed to a heightened risk of infection, that Dr. Kopitnik broke scrub to explain the incident to the patient's family, and then re-scrubbed and completed the surgery.  *See* **Confidential Appendix 15**, O'Connor Deposition Exhibit 16 at Kopitnik-WMC Subpoena 1235.  The son of Dr. Kopitnik's patient was so distraught by the actions of Defendant O'Connor and her lack of regard for his father's safety, that he logged a complaint with WMC.  *See* **Appendix 90**, O'Connor Deposition Exhibit 19.

Defendant O'Connor's removal of the towels from the windows on the doors in Drs. Kopitnik and Steele's operating rooms was obviously not motivated by patient safety, because if that was her motivation, she could have waited until after the surgeries to discuss the window coverings with the doctors or she could have properly "scrubbed-in" and covered her face with a surgical mask before entering the operating rooms.  Defendant O'Connor's true motivation in disrupting the surgeries of the CWN physicians on October 27, 2005 was to further harass the Plaintiffs in an attempt to force them to leave WMC.

Contrary to Defendant O'Connor's assertions in her Memorandum in Support of Her Motion for Summary Judgment, the "annoying incident" of removing the towels from the operating rooms was not a "single and isolated event" but was part of a pattern of discrimination and harassment of Plaintiffs at the hands of WMC and its employees that includes false theft allegations, illegal locker searches, posting of guards at the operating room doors, plans to illegally wire tap CWN's operating rooms, and defamatory reporting of the theft allegations to the *Casper Star-Tribune* by a person or persons at WMC.  As part of the pattern of discrimination and harassment, the towel incident, when viewed by the objective standard as articulated by the 10th Circuit, indisputably contributed to the hostile work environment at WMC directed toward Plaintiffs.  *Potts v. Davis County*, 551 F.3d 1188, 1194 (10th Cir. 2009).  Plaintiffs reasonably believed that if they did not resign their privileges at WMC, some one would plant drugs in their lockers or some similar action that would permanently impair Plaintiffs' ability to continue to practice medicine.  *See* **Appendix 27**, Narotzky 9/30/08 Deposition, pp. 88.

## THEFT ALLEGATIONS REPORTED TO THE CASPER POLICE

On the morning of October 31, 2005, WMC decided that neurosurgical equipment was missing. Defendant O'Connor was consulted and discussed the matter with Diamond and Fulks. Fulks ultimately informed Mike Reid that O'Connor believed that there were allegedly neurosurgical equipment and supplies, valued at $31,904.49, that could not be accounted for by WMC. *See* **Appendix 65**, Deposition Exhibit 152 at CWN 3687. Defendant O'Connor contacted Defendant Diamond and relayed the reports to Diamond. O'Connor stated to Diamond that all of the missing items could be tracked by serial number.[26] Defendant Diamond instructed O'Connor to contact WMC security, which O'Connor did. Fulks, Diamond, and O'Connor apparently viewed a security camera video tape of a back hallway which showed CWN employees leaving the operating room area with a computer (which belonged to CWN) and boxes in the arms of at least one employee. Dr. Kopitnik was only carrying a Styrofoam coffee cup out of WMC. *See* **Appendix 64**, Deposition Exhibit 151; **Appendix 67**, Deposition Exhibit 159; **Appendix 29**, O'Connor Deposition, pp. 141-161; **Appendix 18**, Diamond 9/3/08 Deposition, pp. 246-266.

When O'Connor and WMC employees could not locate the allegedly missing instruments and equipment, O'Connor instructed WMC security personnel, with the consent and direction of Defendants Reid, Fulks and Diamond to contact the Casper Police Department. *See* **Appendix 35**, Schilling Deposition, pp. 72-75; **Appendix 21**, Fulks 11/17/08 Deposition, pp. 18-21, **Appendix 18**, Diamond 9/3/08 Deposition, pp. 246-266. O'Connor and other WMC employees reported to the Casper Police Department that they believed the missing equipment was the property of WMC and that Plaintiffs Doctor Kopitnik, as well as CWN employees, has stolen the equipment and supplies from WMC. *See* **Appendix 65**, Deposition Exhibit 152.

However, in the ensuing law enforcement investigation and a review of that investigation by Natrona County District Attorney Michael A. Blonigen found that there was absolutely no evidence that led him to believe that any of the allegedly stolen equipment had been removed by a member or employee of CWN. In fact, District Attorney Blonigen stated that there was no substance evidence that a theft of any medical equipment had been committed by anyone at WMC, whether by the Plaintiffs or anyone else. *See* **Appendix 64**, Deposition Exhibit 151.

---

[26] This information, supplied by O'Connor to both Fulks and Diamond, was ultimately found to be false. *See* **Appendix 18**, Diamond 9/3/08 Deposition, pp. 271-272.

During the investigation initiated by WMC, hospital personnel quit cooperating with the Casper Police Department.  As a matter of fact, Detective Tim Weinhandl wrote in his Investigative Report that on November 18, 2005 WMC "refused to release" information requested by Detective Weinhandl.  *See* **Appendix 65**, Deposition Exhibit 152 at CWN 3695.  While it is not clear why WMC quit cooperating with the Casper Police Department in the alleged theft investigation against Plaintiffs, it can reasonably be surmised that they did not have any evidence to prove that any of the alleged stolen items were actually stolen, much less stolen by Plaintiffs, <u>and therefore had nothing but exculpatory evidence to relay to the Casper Police Department, which they were unwilling to provide.</u>

Meritless theft allegations that border upon "malicious-prosecution-like scenarios" contribute significantly to the creation of a hostile work environment and are retaliatory in nature.  *See generally, Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996).  Here, it was found by the Casper Police Department and the Natrona County District Attorney that there was **no evidence** that Plaintiffs or CWN staff stole anything from WMC, nor in fact that anything was stolen from WMC. Given this environment of mistrust, suspicion, and outright hostility by named Defendants and other WMC employees, a reasonable person who would find themselves in an situation similar to the environment Plaintiffs found at WMC in October, 2005, would conclude that they had no other recourse but to resign their staff privileges rather than providing Defendants with additional opportunities to besmirch Plaintiffs' good names, reputations and standing within the medical community, and further inhibit their ability to earn a living.

As noted supra, it is also apparent, based on the Affidavit of Casper Police Department officer Brad Wnuk, that someone from WMC reported the theft allegations to the Casper Star-Tribune during the evening of October 31, 2005.  *See* **Appendix 12**, Affidavit of Brad Wnuk.

<u>**LOCKER SEARCHES**</u>

On October 31, 2005, at approximately 3:00 P.M., WMC personnel conducted an illegal, warrantless, non-consensual search of Doctors Narotzky and Kopitnik's lockers at WMC, as well as the lockers of CWN staff.  *See* **Appendix 67**, Deposition Exhibit 159.  In addition to contributing significantly to the hostile work environment at WMC which led to the Plaintiffs being forced to resign their  medical staff privileges in violation of the Fourteenth Amendment, this unconstitutional locker search violated the Plaintiffs' right to be secure from unreasonable searches and seizures as

guaranteed by the Fourth Amendment to the United States Constitution and Article 1, Section 4 of the Constitution of the State of Wyoming.

The locker search was undertaken at the direction of Pam Fulks.  Vicki Diamond was aware that the lockers were going to be searched before the search occurred.  *See* **Appendix 18**, Diamond 9/3/08 Deposition, p. 258; **Appendix 21**, Fulks 11/17/08 Deposition, p. 22-23.

The illegal locker search was conducted under the direct supervision of Defendant O'Connor. *See* **Appendix 35**, Schilling Deposition, p. 77-80.  Also present at the locker search were Vic Thompson, WMC Plant Engineering Manager (who was in charge of security at WMC), Greg Lewallen, WMC Engineering Department employee, and Buck Schilling, a security officer at WMC. *Id*. at 76-78.  The lockers were secured with both locks issued by WMC and personal locks.  Private locks were cut off by Greg Lewallen using a bolt-cutter. *Id*.  O'Connor made the decision concerning which lockers would be searched.  Once the lock was removed, Mary Jane O'Connor would search the contents of the locker.  *Id.* at 79.  Lockers were searched in both the Men's and Women's locker rooms.  *Id.* at 81.  No WMC property was found in the lockers, only the personal effects of the person to whom the particular locker was assigned.  *See* **Appendix 67**, Deposition Exhibit 159 at WMC 3263.

The illegal locker searches were concluded by 3:36 P.M.  *Id*. O'Connor instructed Schilling to report the allegedly stolen neurosurgery instruments and equipment to the Casper Police Department by 5:06 P.M. *Id*. at WMC3262.  Despite the fact that the search of Plaintiffs' and CWN staffs' lockers did not turn up any allegedly missing equipment, Defendant O'Connor never reported this highly exculpatory fact to the Casper Police Department when they arrived to investigate her report later that afternoon.[27]  *See* **Appendix 29**, O'Connor Deposition, pp. 178-179; **Appendix 35**, Schilling Deposition, pp. 92-93; **Appendix 18**, Diamond 9/3/08 Deposition, pp. 264-266.  Compounding her intentional act of withholding exculpatory information, Defendant O'Connor specifically stated to the Casper Police Department that she believed that Dr. Kopitnik stole equipment from WMC.  *See* **Appendix 65**, Deposition Exhibit 152.

---

[27] O'Connor also did not report o the Casper Police Department that she had instructed WMC security guards to conduct surveillance on CWN surgeons and staff since about 10:00 A.M. on October 30, 2005.  *See* **Appendix 67,** Deposition Exhibit 159; **Appendix 35**, Schilling Deposition, pp. 67-69.

Despite the admissions of Defendants Fulks and Diamond that the illegal locker search was conducted on October 31, 2005 with the intent of recovering the allegedly stolen neurosurgery equipment, Defendant O'Connor testified at her deposition that the locker search was *not* conducted in an attempt to locate the allegedly stolen equipment.  In fact, O'Connor testified that "the locks were cut off of the lockers so [WMC] could use [the lockers]."  *See* **Appendix 29**, O'Connor Deposition, 173-175.  Further, she states that the locks were not cut off of the CWN lockers so that the lockers could be searched.  *Id.* at 173.  O'Connor also states that the locks were not cut off of the lockers until after Plaintiffs had resigned their privileges, when in fact the lockers were searched 17 days prior to Plaintiffs' resignation of their privileges.  *See* **Appendix 29**, O'Connor Deposition, 173-174; **Appendix 95**, CWN 4280.  In fact, in direct contradiction to the testimony of Defendants Fulks and Diamond, as well as former WMC Security Officer Buck Schilling, Defendant O'Connor states that she was not in the locker room when the locks were cut and that her last involvement with Plaintiffs' and CWN staffs' lockers was directing security to cut their locks.  *See* **Appendix 29**, O'Connor Deposition, p. 177.  This testimony of O'Connor's flies in the face of the staggering weight of other Defendant's testimony and the WMC Security Incident Report that clearly states that Mary Jane O'Connor personally directed and participated in the search of the lockers of Doctors Narotzky and Kopitnik, as well as CWN staff on the afternoon of October 31, 2005.  *See* **Appendix 67**, Deposition Exhibit 159, **Appendix 19**, Diamond 9/9/08 Deposition, pp. 359-360; **Appendix 35**, Schilling Deposition, pp. 78-80; **Appendix 91**, O'Connor Deposition Exhibit 23.  This contradictory and false testimony of Defendant Mary Jane O'Connor creates a material issue of fact as to the level of her involvement in the search of these lockers that preclude summary judgment as to her liability for the illegal search and her role in the hostile work environment at WMC in the September to mid November, 2005, time frame.

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[28]   Searches and seizures by state actors[29] of the private property of their

---

[28] Article 1, Section 4 of the Constitution of the State of Wyoming provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the

employees are subject to the restraints of the Fourth Amendment.  *O'Connor v. Ortega*, 480 U.S. 709, 715, 107 S.Ct. 1492, 1496 (1987).  A warrantless search is per se unreasonable.  *Mancusi v. Deforte*, 392 U.S. 364, 370, 88 S.Ct. 2120, 2125 (1968).  The only time that a warrantless search, executed without the consent of the person who has a legitimate expectation of privacy in the property to be searched, may be reasonable is when the government actor conducting the search can properly articulate a "special need" beyond that of the normal need for law enforcement, which renders the warrant and probable-cause requirement impracticable.  *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S.Ct. 733, 748 (1985).

Plaintiffs are entitled to monetary damages under 42 U.S.C. § 1983 from state actors who violate their Fourth Amendment rights.  *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 1696 (1999).  The actions of Defendants in conducting this unconstitutional search are part and parcel of the hostile work environment and the constructive discharge of Plaintiffs in violation of the Fourteenth Amendment**.**  *See* **Appendix 4**, Affidavit of Thomas A. Kopitnik, Jr., M.D.; **Appendix 6**, Affidavit of Robert A. Narotzky, M.D., **Appendix 9**, Affidavit of Robert Schlidt, M.D., **Appendix 11**, Affidavit of Debra Steele, M.D.

The locker search conducted at the direction of Defendant Fulks by Defendant O'Connor was unconstitutional for a multitude of reasons.  As a preliminary matter, no warrant was issued by a competent magistrate giving Defendants the authority to search the lockers.  A warrantless search is *per se* unreasonable. *Horton v. California*, 496 U.S. 128, 138, 110 S.Ct. 2301, 2308 (1990).  There were also no "exigent circumstances" that would require the immediate search of the lockers in question.  *Id*.  Defendants had the ability to secure the locker room area to prevent anyone from taking anything out or bring anything additional in until a warrant could be obtained.  Also, the nature of the items being searched for, the allegedly missing neurosurgery equipment, were not such that they would somehow disappear or dissipate before a search warrant could be issued, such as the blood alcohol content of a possible drunk driver.

---

person or thing to be seized.

[29] WMC, Vickie Diamond, and the Board of Trustees have admitted that WMC is a state actor for purposed of this lawsuit.  Mary Jane O'Connor, Mike Reid, and Pam Fulks have failed to address the issue and have waived any claim that WMC is not a state actor.

The locker search was also illegal because Drs. Narotzky and Kopitnik and CWN staff had a reasonable expectation of privacy in their lockers at WMC. The lockers were used solely for their personal use. They had secured their lockers with their own personal locks or combination locks supplied by WMC. *See* **Appendix 18**, Diamond 9/3/08 Deposition, pp. 262-263; **Appendix 24**, Kopitnik 12/22/08 Deposition, pp. 496-497; **Appendix 38**, Steele Deposition, pp. 24-25. The lockers of the CWN doctors and their staff were not used to store work related material, but where used to store highly personal items such as correspondence, clothing, footwear, wallets, keys, and other personal effects. *See* **Appendix 67**, Deposition Exhibit 159; **Appendix 24**, Kopitnik 12/22/08 Deposition, p. 496. WMC individually assigned the lockers to a specific person and no one else at WMC was allowed access to that locker. WMC security rarely, if ever, conducted searches of individual lockers, unless the person to whom the locker was issued had already been discharged. *See* **Appendix 35**, Schilling Deposition, pp.54, 95. The only prior locker search that former WMC Security Officer Buck Schilling could recall from his seven years of employment at WMC was conducted with the consent of the person to whom the locker was assigned. *Id*. at 54. Defendants' illegal search of Drs. Narotzky's and Kopitnik's lockers, as well as those of CWN staff, violated their legitimate expectation of privacy in their lockers. Fourth Amendment rights are implicated in a work related setting if the conduct of the governmental actor, in this case WMC and its employees and administrators, "infringed 'an expectation of privacy that society is prepared to consider reasonable.'" *O'Connor*, 480 U.S. at 715 (*citing United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).

Finally, the search was conducted in the hope of retrieving neurosurgery equipment and instruments that Defendants believed to be stolen. *See* **Appendix 18**, Diamond 9/3/08 Deposition, p. 258. If neurosurgery equipment had been found in the lockers, WMC surely would have conveyed that fact to the Casper Police Department. This search by a state actor within the State's general interest in law enforcement and was not conducted for "administrative purposes", as claimed by Defendant O'Connor in her deposition. *Ferguson v. City of Charleston*, 532 U.S. 67, 78-79, 121 S.Ct. 1281, 1289 (2001).

Defendant O'Connor attempts to justify the illegal locker search by stating that the search was a "work-related search". (Defendant O'Connor's Memorandum in Support of Summary Judgment, pp. 35-37). A public employer may conduct searches of areas that are generally within the

control of the public employer, or are used to further the interests of the employer. *O'Connor*, 480 U.S. at 715. The boundaries of the "workplace context" at a hospital such as WMC include those areas that are related to work and are generally within WMC's control. *Id.* These areas include "the hallways, cafeteria, offices, desks, and file cabinets ..." *Id.* at 715-16. It is clear that the individual lockers that had personal locks or combination locks supplied by WMC securing them, were not under WMC's control at all, and were therefore outside of any possible "workplace exception" to the warrant requirement of the Fourth Amendment.

Defendant O'Connor asserts that Plaintiffs had a diminished expectation of privacy in their lockers at WMC because Plaintiffs last elective surgery at WMC was conducted on October 30, 2005. However, it is undisputed that Plaintiffs did not resign their privileges at WMC until November 17, 2005. In fact, Dr. Narotzky covered several emergency surgeries between the end of October, 2005 and November 15, 2005. Dr. Steele was at the hospital after October 31, 2005, for trauma coverage. CWN had specifically informed WMC that CWN physicians would continue to provide trauma care coverage after October 31, 2005, and in fact, they did provide trauma coverage. *See* **Appendix 27**, Narotzky 9/30/08 Deposition, pp. 70-71, 89; **Appendix 28**, Narotzky 12/9/08 Deposition, p. 198. Plaintiffs had locks on their lockers and still had personal items in those lockers as of October 31, 2005. *See* **Appendix 24**, Kopitnik 12/22/08 Deposition, pp. 496-497. Plaintiffs clearly intended to continue the use of their lockers after October 31, 2005 and had not relinquished control of the lockers. Given Plaintiffs actions and their subjective expectation and intent, they still possessed a reasonable expectation of privacy in those lockers on October 31, 2005.

The illegal search of Drs. Narotzky's and Kopitnik's lockers, as well as those of their staff, on the afternoon of October 31, 2005, conducted per the orders of Defendants Fulks, Diamond, and O'Connor, infringed the CWN doctor's and staff's constitutional rights guaranteed under the Fourth Amendment of the U.S. Constitution and Article 1, Section 4 of the Constitution of the State of Wyoming. The search was conducted by state actors, without a warrant and without consent, in an area in which the Doctors and their staff possessed a legitimate privacy interest. The Defendants clearly hoped that they would find stolen hospital equipment in the lockers. A search conducted without a warrant or consent in an area where the Plaintiffs maintained a legitimate expectation of privacy is unconstitutional. Defendants are therefore liable to Plaintiffs under 42 U.S.C. § 1983 for damages, to be proven at trial, arising from this unconstitutional search. In addition, the illegal

search of Plaintiffs lockers was an egregious act that led to Plaintiffs' constructive discharge by contributing significantly to Plaintiffs' realization that they had no other choice but to resign their privileges due to the intolerable working conditions at WMC.   Plaintiffs genuinely feared that if Defendants were willing to cut off personal locks from Plaintiffs' lockers, they were capable of other illegal and unconstitutional acts directed at Plaintiffs.   *See* **Appendix 27**, Narotzky 9/30/08 Deposition, p. 88

## CONCLUSION

The Plaintiffs had a vested property interest in their privileges at WMC.  The Plaintiffs were subjected to a hostile and intolerable working environment in violation of the U.S. Constitution.  This hostile and intolerable work environment deprived the Plaintiffs of their procedural due process rights under the Fourth Amendment to the U.S. Constitution.  There are numerous material issues of fact which preclude summary judgment in this matter.  The Defendants' motions for summary judgment must be denied.


DATED this 13th day of April, 2009.



SPEIGHT, McCUE & CRANK, P.C.



By:___/s/ Patrick J. Crank_____
   John B. "Jack" Speight (#4-0983)
   Robert T. McCue (#5-2439)
   Patrick J. Crank (#5-2305)
   Matthew D. Obrecht (#6-4107)
   SPEIGHT, McCUE & CRANK, P.C.
   P.O. Box 1709
   Cheyenne, WY  82003
   (307) 634-2994
   Fax:  (307) 635-7155

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 13th day of April, 2009, a true and correct copy of the foregoing was served upon counsel as follows:

| | | |
|---|---|---|
| Scott E. Ortiz | [  ] | U.S. Mail |
| Stephenson D. Emery | [  ] | Fed Ex |
| Williams, Porter, Day & Neville | [  ] | Fax |
| P.O. Box 10700 | [  ] | Hand Delivered |
| Casper, WY  82602 | [ x ] | E-File |
| | | |
| Mark W. Gifford | [  ] | U.S. Mail |
| Gifford & Brinkerhoff | [  ] | Fed Ex |
| P.O. Box 2508 | [  ] | Fax |
| Casper, WY  82602 | [  ] | Hand Delivered |
| | [ x ] | E-File |
| | | |
| Kate M. Fox | [  ] | U.S. Mail |
| Davis & Cannon, LLP | [  ] | Fed Ex |
| P.O. Box 43 | [  ] | Fax |
| Cheyenne, WY  82003 | [  ] | Hand Delivered |
| | [ x ] | E-File |
| | | |
| Anna S. Peckham | [  ] | U.S. Mail |
| Davis & Cannon, LLP | [  ] | Fed Ex |
| P.O. Box 728 | [  ] | Fax |
| Sheridan, WY  82801 | [  ] | Hand Delivered |
| | [ x ] | E-File |
| | | |
| W.W. Reeves | [  ] | U.S. Mail |
| Anna Reeves Olson | [  ] | Fed Ex |
| Park Street Law Offices | [  ] | Fax |
| 242 South Park Street | [  ] | Hand Delivered |
| Casper, WY  82601 | [ x ] | E-File |

   /s/ Patrick J. Crank